## GOLD v. GROVES et al.
### No. 9863.

United States Court of Appeals
Third Circuit.

Argued Oct. 6, 1949.

Reargued March 20, 1950.

Decided May 22, 1950.

Samuel J. Stark, Philadelphia, Pa., for appellant.

Thomas F. Mount, Philadelphia, Pa. (Rawle & Henderson, Philadelphia, Pa., Joseph W. Henderson, Philadelphia, Pa., on the brief), for appellees.

Before McLAUGHLIN and O'CON-NELL, Circuit Judges, and FEE, District Judge.

Reargued before McLAUGHLIN and KALODNER, Circuit Judges, and FEE, District Judge.

McLAUGHLIN, Circuit Judge.

This is a seaman's personal injury suit under the Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. At the end of the plaintiff's case, the Court below granted the defense motion for a direction of verdict. Plaintiff appeals from the judgment entered against him on the verdict.[1]

Gold, the plaintiff, was third cook on defendants' Liberty ship, "James Swan",

---

1. There had been a companion cause of action for maintenance and cure. This was disposed of and does not here concern us.

which, on November 22, 1946 was taking supplies aboard at Savannah, Georgia. The amended complaint alleges that plaintiff was required to do excessive work in loading ship's stores. Among other things, it charges that defendants failed to provide careful, competent, proper and skilful coemployees and superior officers, and that they failed to provide a sufficient and adequate number of men to do the work.

According to the plaintiff, right after the noon meal on November 22, 1946 he was ordered by the steward "to go ahead down and load the meat in the ice-box." No other member of the crew was assigned to that duty with him and no other crew member actually assisted him. The weight of the boxes containing meats ran from 60 to 100 pounds. Barreled turkeys weighed from 185 to 200 pounds and loose pieces of meat from 60 to 250 pounds. With the help, at times, of a stevedore, Gold put away all of the incoming meat, the total weight of which was from 4,000 to 5,000 pounds. The task consumed, at most four hours. Toward the end of it, Gold was tired. He intended hanging one more piece of beef and then taking a rest. The stevedore handed a quarter or side of beef to him and Gold said that, "* * * I grabbed hold of it and got it up and as I got it up almost onto the hook I got the sharp pain across my back, the small of my back, because it was so near the hooks, I just gave it that extra hook and pushed it onto the hook, but momentarily it did actually take my breath away. I was actually hurt and for a couple of minutes, why, I just figured I perhaps twisted my back. I don't know what I had done—it was like a catch—I don't know what I done, and it stopped me momentarily, but we did finish out the load. We finished out the front of the box and we got all of it loaded in there." That incident happened around 4:00 P.M., about an hour before the job was completed. The same night, and thereafter, Gold's back bothered him. The injury claim is for an aggravation to a pre-existing back condition. The treating physician stated that Gold, because of a short leg and resultant tilted pelvis, was more prone to back injuries than the ordinary individual, and that he had a history of an injury in war service to his back. Regarding the alleged injury, the doctor said, "And then he has a job doing heavy lifting, according to his statement, and he suffered another low back sprain; * * *. I think it was simply an aggravation of a preexisting condition."

Prior to his experience on the "James Swan", Gold had served as chief cook for two voyages on Liberty ships and for a voyage on a tanker which had almost the same setup as a Liberty ship. He said that it was the duty of the chief cook, second cook, and sometimes the third cook, to load the meat; that the stevedores would bring the stores to the meat or chill-box storeroom doors; and that the stewards' department would take them from there. He was clear that the loading of the meat was more than one man's job; that it was too much for one man, and that the chief cook, the second cook and the third cook, if the latter was available, would all work together in the ice-box.

Gold's testimony about the stevedore who was at the ice-box, does present some difficulty. As the lower Court said, "There is no testimony that he asked the man for help and the man refused him. On the contrary there is testimony, both direct and cross, that the man helped him, but that he did not ask him on this particular occasion." And Gold did agree with the Court that if he had needed it, the stevedore would have helped him. The Court had the impression that Gold had testified that the stevedore "was there to help". Since Gold was in charge of the loading the Court sustained the objection to the following question asked the plaintiff: "Was this stevedore that was helping you subject to your orders?" The Court said: "I don't see what difference it makes. He had previously asked him. The man had helped him before. I will sustain the objection to that." On cross-examination, however, Gold had made it abundantly clear that he had no supervision over the stevedore. To the question, "And you had a stevedore standing right by you to help you, didn't you?" Gold answered, "Sir, I had that stevedore there. I could ask

him. He could help me, sir, if I asked him, but he could turn around and tell me to kiss his foot if he didn't want to help me." Again Gold said, "Sir, I couldn't ask him. If I wanted—I mean if it actually comes right down to it, I didn't have the authority to even ask him to help me." And the fact remains that the assistance Gold said he had the right to expect, namely, from the stewards' department, was absent.

The other witness in the plaintiff's case was Anthony Branconi, who testified as an expert. He is a Merchant Marine chief cook experienced on Liberty ships, including the "Stockton", which is operated by the appellees. He said that if galley stores are received in the afternoon, all three cooks go down to the meat box and take care of them. If they come in during the morning, the chief cook and the second cook generally go below with a third man, maybe a messman or utility man, and store the meats. He said that stevedores never had anything to do with loading the meat in the ice-box; that they would bring it to the box "and we would handle it from there". In answer to the Court's question whether a stevedore would be used if he was at the storeroom door with the stores, Branconi said, "We would get someone in the stewards' department". As to authority over stevedores he stated, "We can't tell them anything, Your Honor. We don't give them no orders. The only man that I could ask to help me would be the stewards' messman or utility man, or cook, or anybody else in my department." He was positive that " * * * you should always have three men down to the meat box. * * * From the stewards' department, which is the galley force." On cross-examination he was firm that it was the chief cook's duty to hang the meat with the help of two men from his department, usually the second and third cooks. He said passenger vessel practice was different but that he had never been on a freighter where a stevedore hung the meat or where the chief cook had directed a stevedore to hang meat.

There was introduced into evidence an excerpt (page 53, Section 3) from the employment agreement in force at the time, titled "Handling Stores", which reads as follows: "Members of the Stewards Department shall not be required to carry any stores or linen to or from the dock. *But when stores or linen are delivered at the store room doors, meat or chill box doors, Stewards Department shall place same in their respective places* and overtime shall be paid to all men required to handle linen or stores. However, daily provision such as fresh vegetables, fruit, milk or bread shall be stored by messmen and/or utilitymen when placed on board, without the payment of overtime provided such work is done within their prescribed eight (8) hours." (Emphasis supplied.)

The defense motion for a direction of verdict urged that there was no evidence of any negligence; no proof that the company did not do what was necessary to be done. With reference to the contention that the company did not give the plaintiff sufficient assistance in the way of fellow workmen or company employees, the defense argued that the stevedore was present with the plaintiff; had helped the plaintiff at the latter's request; and that the plaintiff could have obtained help the time he felt the back pain, but that "he did not request it because he thought he was able to do the job himself." The Court found that, "The plaintiff has not met the burden of proof required of him in this case. I don't think that they have shown negligence on the part of the defendants."

The testimony is confusing. It contains both apparent and real contradictions. At the time of the motion for direction attention was undoubtedly focused upon the facts that the stevedore had been at the ice-box; that he had previously helped Gold; that he had not refused aid when requested, and that when Gold felt the sharp pain he had not asked the stevedore's assistance. While it might well have seemed offhand that Gold had been hurt because he had declined readily available help, we do not think that this is indicated as a matter of law, nor that there is a total lack of credible evidence to the contrary. At this stage of the proceedings we are concerned solely with whether the testimony

on behalf of the plaintiff, and reasonable inference to be drawn from it in the light most favorable to the plaintiff, made out a prima facie case allowing the plaintiff to have a jury pass upon his cause of action. Schad v. Twentieth Century-Fox Film Corporation, 3 Cir., 136 F.2d 991, 993.

Tested by the above rule, we find that there is evidence from which the following could be inferred; that the manner in which the meat was loaded was important because on it depended the accessibility of the meat during the voyage; that the meat was always loaded by experienced personnel from the stewards' department, usually three people, and most of the time, the three cooks; that the loading was too much for one man; that the stevedores' duties stopped at the storehouse doors; that stevedores never loaded the meat supplies on freighters, and that the present instance was the only time Gold had seen a stevedore helping with such loading; that Gold had no authority over the stevedore; that in loading the meat as he did without anyone else from the galley, Gold had acted under the order of his superior; that after three hours of work in which he had occasioned unskilled help from a stevedore, Gold became tired; that as he lifted a quarter or half of beef he felt a sharp pain in his back; that the particular piece of beef had just been handed to him by the stevedore; that Gold raised it in order to hang it and it was then he felt the sharp pain; that it was questionable whether he really had an opportunity to request the stevedore for further assistance with the particular piece of beef prior to feeling the acute pain; that there is no evidence that the further pushing of the beef on the hook after Gold had felt the pain, caused him any additional pain or complications.

A jury could conclude that in Gold's condition, after three hours work ordinarily done by three skilled men, he was so tired that the lifting of the piece of beef overtaxed him and resulted in the sprain; it could also conclude that his three hours' effort had already produced an aggravation to his back condition which merely manifested itself by a pain symptom when Gold tried to hang the beef; it could conclude

from the medical evidence, that the general loading operation aggravated Gold's bad back.

Contrary to the assertions of appellees there is support in the plaintiff's case for the propositions that: 1. the defendants had failed to provide sufficient help; 2. the absence from the ice-box of other members of the stewards' department was the cause in whole or part of the injury; 3. he was injured because he was doing the work of more than one man.

We think plaintiff created a fact issue. It is much the same sort of claim as was present in The Magdapur, D.C.S.D. N.Y., 3 F.Supp. 971, 972, where an assignment of an inadequate number of men to take in a wire on a ship was held to be evidence of negligence. Appellees urge that the facts in that decision show that the stevedore in the instant matter was just as much a part of the available ship's help to Gold as were the men from shore aboard The Magdapur. But the latter situation was quite different. The men from shore had been provided by the owner "to help move the ship" and taking in the wire was part of their employment. The stevedore's duty on the "James Swan", as the testimony and employment agreement tend to show, was to bring the meat to the ice-box door, not to hang it in the ice-box. Comparable Federal Employees Liability decisions flatly support the proposition that failure to provide sufficient help is a ground of negligence. Blair v. B. & O. R. Co., 323 U.S. 600, 602, 603, 65 S.Ct. 545, 89 L.Ed. 490; Deere v. Southern Pac. Co., 9 Cir., 123 F.2d 438, 441; Chesapeake & O. R. Co. v. Winder, 4 Cir., 23 F.2d 794.

We find that plaintiff did make out a prima facie cause of action which entitled him to go to the jury. We express no opinion, of course, on the merits of the plaintiff's claim.

The judgment of the District Court will be reversed and the case remanded for a new trial.

Separate Opinion

JAMES ALGER FEE, District Judge.

The defendants are here held open to liability as "involuntary good Samaritans,"

for so Dean Pound brilliantly characterizes the recipient of liability who is without fault and who has done nothing which could be considered as even a remote cause of injury. In industrial litigation, it is currently said the tests of fault and causation are outmoded. But defendants should not be required to pay for an aggravation of congenital weakness and previous traumatic injury brought on by the voluntary attempt of plaintiff to lift a piece of meat which was too heavy for his strength. Defendants had no notice or knowledge of the weakness which caused the alleged injury. By employing this individual, perhaps involuntarily through a hiring hall, they did not insure him against strain placed on his weakened frame. They were entitled at least to an able body or notice of defect. Even an insurance company is permitted to inquire into the nature and extent of the risk and to write a policy based upon personal warranties of the assured.

There is no evidence of fault of defendants. It is not negligence to permit an able-bodied man alone to hang four or five thousand pounds of meat in the time here involved. It is not negligence to allow an able-bodied man alone to hang a piece of meat weighing one hundred twenty pounds. Specifically, there is not a shred of evidence in this record on this point. The fact that two men of the stewards' department besides Gold were not furnished was then not a fault.

No causal connection was shown between any act or omission of defendants and any injury. If an able-bodied man had been in Gold's place, no harm would have come from the failure to have two or three other members of the stewards' department in the cold room.

No act or omission of defendants was then a fault or connected with the chain of causation. No one was at fault but plaintiff. He had a congenital tilted pelvis and had had a traumatic injury to the spinal area. Of this condition he alone knew. No physical examination had been made by defendants, and Gold had not disclosed his condition. He did not explain his condition and ask for help when the steward ordered him to hang the meats. He claims to have been highly experienced and trained for this work. He was in full control as to speed, rest periods and methods. He testified that, whenever he thought he needed help, he asked the longshoreman who was passing in the meats to assist him. The longshoreman did help Gold each time he was asked. The question of whether he was bound to help when requested is immaterial. An able body was the only necessity, and the longshoreman furnished that.

Gold testifies that, if the two men whom he claims were required had been present, he would have asked one of them to help him only if a piece of meat were, in his judgment, "too heavy."

In the midst of the work, there was a piece of meat which plaintiff believed he could handle alone. While he was hanging this piece, unexpectedly and inexplicably, he had a catch in his back. Notwithstanding he was in charge of the work, Gold elected to continue the task and hang all the rest of the meat available. He now claims aggravation of his former injuries, congenital and traumatic, thereby. The sole cause of any injury was the physical condition of Gold and his decision that a piece of meat weighing one hundred twenty pounds was not "too heavy" for him to lift alone.

The tests of fault and causation should not be discarded by judicial fiat so long as all members of the industrial community still insist upon trial in common law fora.

The Trial Judge was entirely correct in the belief that there was not even a scintilla of evidence upon which the jury could give a verdict for plaintiff.

The strong feeling which the writer has for submission to a jury impels concurrence in reversal.[1] The Federal Rules, 28 U.S.C.A., now give opportunity for a Trial Judge to reserve the question of a directed

1. Local 36 of International Fishermen & Allied Workers of America v. United States, 9 Cir., 177 F.2d 320, 338–42; See dissenting opinion, Menefee v. W. R. Chamberlin Co., 9 Cir., 176 F.2d 828, 830, 834.

verdict until after the jury has spoken. Then there is always the opportunity to grant new trial. Therefore, a Trial Judge should trust the machinery of the Court over which he presides rather than what an Appellate Court will say about the implications of a cold record.