Preston Lee **TYNDALL**

v.

**CONDUIT AND FOUNDATION CORPORATION.**

**No. 239 of 1956.**

United States District Court
E. D. Pennsylvania.

Jan. 13, 1959.

Milton M. Borowsky, Philadelphia, Pa., for plaintiff.

John B. H. Carter, Pepper, Bodine, Frick, Scheetz & Hamilton, Manus McHugh, Strong, Sullivan, Saylor & Ferguson, Philadelphia, Pa., for defendant.

EGAN, District Judge.

This is an admiralty action in personam. Libellant's case follows the usual pattern in that it charges that the carfloats on which libellant was working at the time he suffered injury were unsea-

worthy; also that respondent was negligent in failing to provide libellant, among other things, with a safe place to work; and that libellant is entitled to maintenance and cure, both past and future.

It was tried to a judge without a jury over a period of three days. It was well presented by able counsel on both sides. Briefs have been filed and argument has been heard and it is ripe for decision.

The Court makes the following

### Findings of Fact.

1. Libellant resides at Milford, Delaware, and is 48 years of age and has a life expectancy of 24½ years.

2. On September 9, 1955, the date of the accident, and for about five years prior thereto, libellant was employed by respondent.

3. Respondent is a Pennsylvania corporation engaged in the general contracting business, including the building of bridges on, along and across navigable streams, and engages in dredging operations in connection therewith.

4. On the date mentioned, and in addition to the two carfloats in question, respondent owned the dredge Biff and the workboat or barge Harry, Jr.[1] The Biff was registered under the U. S. Customs Service but the Harry, Jr. was not. Registration of a carfloat or barge is unnecessary where used only for freight in the harbor.

5. On the date mentioned, libellant's duties were twofold: As Chief Engineer of the dredge Biff they consisted of maintaining and operating the engines which worked the cutting and suction equipment and the various pumps necessary to prime the engines and cool them; maintaining and operating the winches controlling the lines which enabled the dredge to "walk" at the site of operations by means of spuds; secondly, as Master of the Harry, Jr. they were to tow the dredge Biff from place to place, and to transport and deliver materials used in dredging operations. At the time in question, the dredge Biff was working in navigable waters back of Atlantic City, N. J. (N.T. 139).

6. On or about July 19, 1954, respondent purchased from the surplus property of the Pennsylvania Railroad two carfloats known as Penna. Railroad No. 585 and Penna. Railroad No. 586, respectively (herein for brevity 585 and 586.). They were purchased on the premise that they might be of use to respondent if it obtained a job on the river, with no specific job in view. The carfloats were each approximately 175 to 180 feet long and 30 to 35 feet wide.

7. At the time of their purchase, they were tied up at the old ferry boat wharf in the Delaware River at Camden, New Jersey. Both carfloats were towed from the wharf at Camden by Sheridan Transportation Company, which is not involved in these proceedings, up the Delaware to an old Warner Company dock in a basin or lagoon connected by a channel or passage with the Delaware near Tullytown, Pennsylvania. After they were tied up at the Warner Company dock, they were never again moved by human hands until some time after a violent storm struck in August 1955.

8. Prior to this storm and in August 1955 while the two carfloats were moored to the Warner Company dock, both carfloats had taken on water and the crew of the Biff, including libellant, were sent to the scene to work on them and to raise, repair and restore them. A 3-inch pump was being used and 585 was almost pumped dry and preparations were made to pump out 586.

9. After the storm struck, 585 was found to have been washed high and dry athwart the pilings which edged the shore of the basin with her bow extending out over the water beyond the pilings just above 586. The latter remained in the water below and had sunk in approximately 12 to 15 feet of water. The

---

[1] Respondent also owned two workboats Richard II and Pontoon Barge No. 1. (See answer to 18th interrogatory). These were not referred to in the testimony.

deck and hull of the 585 were caused to sag and belly approximately 2 feet in the center.

10. When the damage caused by the storm had been surveyed, then, on or about August 31, 1955, the crew of the Biff was again dispatched to the carfloats. Carfloat 586 was pumped dry and floated and was left tied up to the offshore side of 585.

11. Thereafter, from about September 2, 1955, the 586 was capable of being towed and libellant was assigned by Krantz, the respondent's superintendent, to go aboard the 586 for the purpose of keeping her pumped out, caulking her seams and to perform whatever was necessary to maintain 586 afloat. Libellant alone performed this job from day to day until the accident and was visited on various occasions by Krantz.

12. On September 9, 1955, the conditions of wind and tide were such that carfloat 586 began to float in broadside under the bow of 585 which extended from the pilings above and threatened to collide with her, with possible damage to 586.

13. To guard against this, libellant alone undertook such preventive measures as were possible. He traveled to Tullytown in his own motor car without tools or equipment of any kind, except a hammer and nails and some odd tools which he personally carried in the back of his car.

14. After appraising the situation at the scene, he took some heavy planks from the deck of 585, procured his hammer and some nails and nailed three planks at various distances to the fully exposed side of 585 to act as a fender or buffer to protect 586 in case she washed in.

15. Not being satisfied, he decided to extend the fender or buffer and to add another plank to the end of one of the three planks already nailed in place. He stood on the deck of 586 and was in the act of nailing the fourth plank in place when the wind and tide carried 586 up against one of the plank buffers on 585

and he sustained the injuries complained of, including a crushed right knee.

16. Since libellant was alone on the job at the time, he managed, with extreme difficulty, to pull himself up across 585 and the pilings to the shore where his cries for help were answered by some persons fishing nearby.

17. They summoned the police and libellant was assisted to the Lower Bucks County Hospital. There it was determined that he had suffered a comminuted fracture of the proximate end of the tibia and fibula of the right leg and a full leg cast was applied. Thereafter, on the same day, he was taken by ambulance to his home in Milford, Delaware, where he went under the care of his family physician, Dr. W. T. Chipman.

18. Libellant wore the cast for about eleven weeks and when it was removed, he wore a leg brace up to April 6, 1956. During the period he wore the cast, there was an effusion of fluid in the soft tissue in the popliteal area and a window was cut in the back of the cast and the fluid was withdrawn.

19. During the months of January to March 1956 inclusive, libellant underwent a course of physio-therapy treatments in an attempt to overcome a foot drop and ankylosis. In March 1956, Dr. Chipman advised him to see a specialist.

20. In April 1956, he was X-rayed and examined by Doctor Ralston, a specialist retained by respondent's compensation carrier, who prescribed hot compresses and a course of exercises. Libellant did not seek further medical advice, although it was suggested he do so, but continued applying hot compresses and taking the exercises for a period of approximately three months thereafter.

21. Libellant has a limitation of motion of the knee and ankle of the right leg which will be permanent in nature. It is doubtful that any further cure could be effected even if he submitted to additional medication. There is a marked atrophy of the muscle of the right side of the right leg and a one-half inch shortening thereof. The tibia has healed with

a tilt which affects the knee joint and the motion of the ankle joint. The right knee buckles under weight and libellant has not been able to accommodate his right foot to uneven surfaces. He suffered intense pain and still suffers pain when walking, stooping, squatting and kneeling.

22. Prior to the date of the accident, his earnings, with overtime, averaged $7,000 per year. On that day he was paid at the rate of $2.35 per hour. Since then the rate of hourly pay for dredge workers has increased as follows:

Effective July 1, 1956 ....... $2.65
    " September 30, 1957 .. 2.80
    " April 1, 1958 ........ 2.85
    " September 30, 1958 .. 3.05

23. Libellant continued to be paid at the same rate as a dredge worker on the Biff up to and including the date of the accident, although on the latter date, he was working on the carfloats doing a job which a laborer could have done.

24. Because of his injuries, libellant has not worked since September 9, 1955.

25. Libellant has suffered past losses of earnings just short of $20,000, if we exclude later increases in hourly pay. His future earning capacity has been visibly diminished by limitations and impairments of a permanent and progressive nature which have resulted from his injuries.

26. Libellant was a seaman at the time of the accident by reason of his duties and services aboard the Biff and the Harry, Jr. and his status as such carried over when he was assigned, in the course of his employment, to repair and keep afloat respondent's carfloat 586; and this despite the fact that he was a member of an Engineers Local of the Brotherhood of Operating Engineers and was not a member of or affiliated with a maritime union.

27. Respondent never intended to use the two carfloats for purposes of navigation, even if they had been fully restored. They were to be added to respondent's fleet and used as pontoons or workboats in connection with river bridge jobs; a power shovel was to be placed on one and trucks to service it were to be run back and forth from the shore on the other. They were to be towed from place to place in the river as circumstances required, either by the Harry, Jr. or some other vessel.

28. Libellant was a "seaman" while in the employ of the Biff and the Harry, Jr. and his status did not change when he was sent by respondent, in the course of his employment, to work on the two carfloats which were to be added to respondent's fleet as pontoons or workboats and which had no crew of their own.

29. The work that libellant was doing on the two carfloats was in direct relationship to the Biff and the Harry, Jr. (of which he was a crew member), which were vessels in navigation in that they would be used separately or in combination with those vessels in performing river work had the carfloats, or either of them, been restored to a serviceable condition. Thus viewed, he was a seaman acting in the course of his employment as a member of the crew of the Biff and the Harry, Jr. which are vessels in navigation.

Conclusions of Law.

1. This Court has jurisdiction over the parties and the subject matter of this cause.

2. Libellant was in the employ of the respondent, a general contractor, on September 9, 1955 and for some years prior thereto.

3. On September 9, 1955 libellant was a regular employee of the crew of the dredge Biff and Master of the Harry, Jr. a motor vessel used to tow the dredge and other workboats owned by the defendant upon navigable waters and therefore, on said date, was a seaman entitled to the benefits of the Jones Act, 46 U.S.C.A. § 688 and the General Maritime law.

4. Libellant did not lose his status as a member of the crew of the dredge Biff and Master of the Harry, Jr. when he was ordered, in the course of his employment, to perform certain work upon the

two carfloats 585 and 586 which were to be added to the respondent's fleet as workboats or pontoons.

5. Respondent was negligent and its negligence was the proximate cause of libellant's injuries in the following respects:

(a) Number 585 was left in a foreseeably dangerous position with her bow overhanging the pilings and no attempt was made to change her position or to dismantle her (which respondent did later), although several days elapsed between the date of the storm and the date of the accident.

(b) In failing to move 586 and moor her at a point where there was no danger of her washing up against the 585 because of a foreseeable change in wind and tide with the result that the accident happened.

(c) In failing to furnish libellant with buffers or other equipment which would prevent 586 from washing in under 585.

(d) In failing to furnish libellant with a reasonably safe place to work, or with proper and adequate assistance and with proper and adequate tools and equipment to permit him to perform his duties with reasonable safety.

6. The injuries which libellant suffered on the said date were the proximate result of the negligent failure of the respondent to furnish him with a reasonably safe place to work and proper and adequate tools and equipment and help to perform his duties with reasonable safety. In following the orders of his superior and in conscientiously performing his assigned duties, the libellant did not assume the risks as caused by respondent's negligence and he was free of any contributory negligence.

7. Libellant is entitled to recover the sum of $47,500 in damages from the respondent, the Conduit and Foundation Corporation.

8. Respondent is liable to the libellant for maintenance and cure for the period of time that he has been under disability and could be benefited by medical care and attention. It is agreed that subsistence shall be computed at the rate of $8 per day. This period has been determined to be from September 10, 1955 to March 30, 1956, a period of 200 days or $1,600. To this sum there is added $160 for unpaid medical bills and the sum of $1,722.50 is deducted as a credit for compensation benefits paid to libellant by respondent's insurance carrier before the commencement of this action. A net award in favor of libellant for maintenance and cure is the sum of $38.50. This is in addition to the sum found as damages as stated above.

### Discussion.

The main question in this case is whether libellant was a seaman at the time of his injury, thereby entitling him to recover under the Jones Act, 46 U.S.C.A. § 688. Libellant first contends that he was a seaman because the carfloats themselves were vessels in navigation and that he was employed thereon as a member of the crew performing duties traditionally done by seamen. Secondly, it is contended that libellant was a seaman by virtue of his duties aboard the Biff and the Harry, Jr. and that his status as such continued when he was temporarily ordered by his superior, Krantz, in the course of his employment, to proceed from the Biff which was working in navigable waters, to repair and to place the carfloats in floating condition, and that his status as a seaman carried over and never left him while he was working on them.

Without deciding at present whether the carfloats were vessels in navigation, we prefer to rest our finding for the libellant on the ground that he was a seaman aboard the dredge Biff and the Harry, Jr. and that the injuries he sustained on September 9, 1955 occurred during the course of his employment as a member of the crew of those vessels who was temporarily assigned the job of getting the carfloats in condition to permit them to be used by the respondent.

Whether a person is a seaman or not is generally a question of fact to be determined from all of the surrounding cir-

cumstances. There is no question that libellant was a seaman as Chief Engineer on the Biff and as Master of the Harry, Jr. However, in order to recover under the Jones Act, the injury must occur "in the course of his employment" and recovery has been allowed in cases where the injury has occurred on shore. O'Donnell v. Great Lakes Dredge & Dock Co., 1942, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; Senko v. LaCrosse Dredging Corporation, 1957, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404.

The Jones Act, as well as other admiralty legislation, is remedial in nature and should be liberally construed to offer the protection Congress intended to this group of individuals. In order not to frustrate that purpose, we find that libellant was injured in the course of his employment with the Biff and the Harry, Jr. when he was temporarily engaged in repairing and refloating the carfloat and performing duties normally done by seamen. Other fellow crewmen from the Biff were assigned from time to time to work on the carfloats and Krantz, who was Master of the Biff, came to supervise the work being done on the carfloats on various days. Surely it cannot be said that libellant, along with his other fellow crewmen, had lost their status as seamen or were no longer in the course of their employment, for to so hold would defeat the efforts of Congress to afford a remedy to just such an individual in the position of the libellant.

█ We come now to the question of negligence and the application of the Jones Act.

We have found above that libellant was a regular employee of the crew of the dredge Biff and Master of the Harry, Jr., a motor vessel used to tow the dredge and other workboats owned by defendant upon navigable waters and that by reason thereof he was, on the date of the accident, a seaman entitled to the benefits of the Jones Act, 46 U.S.C.A. § 688.

There is no doubt that the injuries libellant suffered on the date of the acci-

dent were caused by the negligent failure of the respondent to furnish him with a reasonably safe place to work and proper and adequate tools and equipment and additional manpower to enable him to perform his duties with reasonable safety. The danger which was inherent in the situation and certainly foreseeable was that the 586 would ride up under and collide with the bow of the 585 which was athwart the pilings with her bow jutting out above for an entire week after the storm, without removing her or dismantling her, an act which respondent performed after the injuries to libellant. Further no buffers or appliances of any kind were provided which could have been attached to the stranded 585 to ward and fend off the 586 which was anchored below. It was a further act of negligence to expect the libellant singlehanded to handle heavy planks and to hold them in position where he could safely nail them to the starboard side of the stranded 585 without considerable danger to himself. Under such circumstances, there is no question about the defendant's negligence and that the negligence was a proximate cause of libellant's injuries. See Gold v. Groves, 3 Cir., 1949, 182 F.2d 767, Hanson v. Luckenbach S. S. Co., 2 Cir., 1933, 65 F.2d 457, and Ferguson v. Moore-McCormick Lines, 1957, 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515.

Because the libellant was a seaman and was injured during the course of his employment while doing work that is customarily done by seamen, we have found that he is entitled to maintenance and cure as a member of the crew of the Biff and the Harry, Jr. It is agreed that subsistence, if awarded, shall be computed at the rate of $8 per day. We have found that he is entitled to maintenance and cure for the period of time that he was under disability and could be benefited by medical care and attention. This period runs from the date of the accident to March 30, 1956 when he refused further medical treatment on the theory that it could not benefit him.

To the extent that the findings of fact and conclusions of law adopted by the Court differ from those requested by the respective parties, the latter are denied.

Counsel will submit an appropriate form of Order.