FOSTER–MILLER, INC.

v.

BABCOCK & WILCOX CANADA.

Civ. A. No. 93–12465–RGS.

United States District Court,
D. Massachusetts.

Feb. 25, 1994.

272

James J. Foster, Wolf, Greenfield & Sacks, Boston, MA, for plaintiff.

Peter L. Resnik, Cherie L. Krigsman, McDermott, Will & Emery, Boston, MA, for defendant.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION*

STEARNS, District Judge.

Foster–Miller, Inc. has brought suit in Massachusetts against Babcock & Wilcox Canada [BWC] alleging violation of a confidentiality agreement, misappropriation of trade secrets, and unfair competition. Jurisdiction of the court is claimed pursuant to the Massachusetts Long Arm Statute, G.L. c. 223A. The case is before the court on BWC's motion to dismiss for lack of personal jurisdiction, or alternatively on grounds of forum non conveniens.

### STANDARD TO BE APPLIED

When personal jurisdiction is challenged, a plaintiff bears the burden of establishing that jurisdiction exists. *Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 979 (1st Cir.

1986). As described in *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 675–678 (1st Cir.1992), three different methods of adjudicating disputes over personal jurisdiction have evolved, each with its own quantification of the showing that a plaintiff must make. The most prevalent is the *prima facie* standard. It requires that a district court accept any affirmatively supported proffer of evidence by a plaintiff as true. If the proffered evidence, duly credited, is sufficient to support findings of all facts necessary to establish jurisdiction, the plaintiff has met its burden. "A court may [however] determine that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam* jurisdiction." *Boit,* supra at 676. This added showing may take the form of a quasi-evidentiary hearing in which the court takes oral testimony as well as receiving stipulations, affidavits, deposition transcripts, authenticated documents, answers to interrogatories and requests for admissions. In evaluating the proffered evidence the court may apply a preponderance of the evidence standard or a standard intermediate between preponderance of the evidence and *prima facie* showing. Applying the intermediate standard, a court "even though allowing an evidentiary hearing and weighing evidence to make findings ... may merely find whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Boit,* supra at 677. This "middle course" is recommended as avoiding "troubling" issues of preclusion that may arise when a court finds conclusively a fact in a pretrial setting that is contrary to the position a party wishes to assert at a jury trial. See *Boit,* supra at 677–678; *Val Leasing, Inc. v. Hutson,* 674 F.Supp. 53, 55 (D.Mass.1987).

The middle course was the one chosen here. There is no dispute that BWC, a Canadian corporation, is a stranger to Massachusetts. The grounds for personal jurisdiction under the Long Arm Statute rest on a single event, the presence of a BWC employ-

ee, Daniel St. Louis, at a technical briefing at Foster–Miller's Waltham, Massachusetts plant on May 11, 1990. Foster–Miller alleges that St. Louis was given confidential information during the briefing that BWC later exploited to its own advantage. That anything of a proprietary nature was disclosed at the Waltham meeting or subsequently misused by BWC is hotly disputed in the supporting materials accompanying BWC's motion to dismiss. Having weighed the substantial conflicts in the proffered evidence, the essentiality of that evidence to a finding of jurisdiction, and the squandering of time and resources of the court and litigants that would result should plaintiff ultimately fail in carrying its jurisdictional burden, I agreed with the Judge who had the case before me that plaintiff should be put to its proof in a preliminary hearing of the kind authorized by *Boit.*

On February 1 and 2, 1994, the hearing was held. Each party presented several live witnesses, and offered affidavits, deposition testimony, and a number of documents. Final arguments on the motion to dismiss were heard on February 15, 1994, after the filing of post-hearing memoranda.

I have characterized my conclusions as "findings." These are not findings in the traditional sense, but rather signification of my assessment that the parties have shown a likelihood of the existence of each of the facts I have "found." The First Circuit has analogized the intermediate standard to the "likelihood of success on the merits" standard applied to a motion for a preliminary injunction. I prefer an analogy to probable cause in a Fourth Amendment sense, that is, whether a reasonable person evaluating the evidence would find it probable that a fact essential to jurisdiction does (or does not) exist, although the choice of analogies I doubt is of any material significance.

### FINDINGS

Based on the credible evidence, I find the probable existence of the following facts.

1. Foster–Miller is a Massachusetts corporation based in Waltham. Its principal business is the supply of sludge and particle removal services to operators of U.S. nuclear steam boilers. Foster–Miller, while it does not maintain Canadian offices, regularly solicits and conducts business in Canada. The creative force behind Foster–Miller is Robert A.S. Lee, the inventor of CECIL (Consolidated Edison Combined Inspection & Lancing system), a robot that uses a flexible lance to direct a pressurized jet of water at metallic sludge deposits that accumulate in a nuclear generator's boiler. The flexible lance is the innovative aspect of CECIL, as it allows a 90° penetration of the configuration of heat exchange tubes common in U.S. built nuclear boilers. The patent to the CECIL technology is owned by Electric Power Research Institute, a District of Columbia corporation headquartered in Palo Alto, California. The technology is licensed exclusively in the United States and Canada to Foster–Miller. CECIL is also protected by a Canadian patent.

2. BWC is a division of Babcock & Wilcox Industries, Ltd., a Canadian corporation with a principal place of business in Cambridge, Ontario. BWC builds and services nuclear steam generators of the Candu design, the most common nuclear generator in use in Canada. The Candu system's boiler differs from its American counterpart in deploying a more densely packed configuration of heat exchange tubes with consequently narrower intertubal gaps. BWC is not licensed to do business in Massachusetts. It has no Massachusetts offices, owns no domestic property, provides no services to Massachusetts utilities, and does not solicit business from Massachusetts residents.

3. BWC's cleaning technology had historically resembled CECIL in relying on a high pressure hydraulic jet directed by a manipulable lance. However, unlike CECIL's flexible lance, BWC's rigid lance, even when augmented by an articulated segment, allowed only a 30° penetration of the tube bundle in the Candu boiler. Recognizing the limitations of its lancing system, BWC in 1989 began to develop a flexible lance of its own. A prototype made of stainless steel proved unsatisfactory because of metal fatigue. BWC consequently began looking for a more durable alternative. All of the key personnel involved in the redesign of BWC's lance were familiar with the CECIL technology. The

basic principles of the technology were widely disseminated within the nuclear industry and were the subject of an illustrated article, co-authored by a Foster–Miller engineer, that appeared in January, 1989, in *Nuclear Engineering International,* a trade journal. The article had been carefully studied by BWC engineers.

4. As early as 1988, Foster–Miller and BWC had discussed the possibility of a joint venture to provide sludge removal services to Ontario Hydro, one of Canada's largest nuclear utilities. These discussions, however, had ended before the May 11, 1990 meeting.

5. In late 1989, the Candu Owners' Group, of which Ontario Hydro is a member, commissioned Foster–Miller to study the possibility of adapting CECIL for use in servicing the Candu boiler. (BWC received a similar contract to develop a competing alternative of its own). The task was initially assigned by Foster–Miller to one of its engineers, William Leary. Leary undertook to locate a hose of a small enough gauge to fit within the narrow Candu tubal apertures, yet durable enough to withstand the extremely high water pressure required to effectively dislodge contamination. Leary surveyed commercially available hoses without finding any of sufficient pressure tolerance and flexibility. Leary did find a hose reinforced with a Kevlar wrap. This may have inspired his idea of doubling the Kevlar sheath to increase the hose's bursting strength. Leary broached the concept with Hugo Kruesi, the President of U.S. Composites, then Foster–Miller's hose supplier. On April 3, 1990, U.S. Composites delivered to Foster–Miller a double wrapped hose based on a prior Foster–Miller exemplar that met Leary's specifications. Hose in hand, Leary began designing the appropriate fittings.

6. In March of 1990, Robert Lee and Daniel St. Louis, a BWC engineer, attended a nuclear sludge management conference in Nashville, Tennessee. St. Louis had met Lee the previous month during a visit Lee made to BWC's offices where they had casually discussed the high pressure hosing incorporated in Foster–Miller's water lance. St. Louis was then and afterwards involved in BWC's effort to develop a flexible lance. At the Nashville conference, Lee made a presentation on the CECIL technology. Lee and St. Louis discussed the concept of reinforcing hydraulic hoses with high strength fibers. After the conference, St. Louis wrote to Lee referencing the conversation and suggesting Aramid fiber as a possible candidate.

7. In May of 1990, James Malaugh of Ontario Hydro (acting on behalf of the Candu Owners' Group) asked St. Louis to accompany him to a meeting on May 11 at Foster–Miller's plant in Waltham. Malaugh expected to discuss methods of testing water lancing erosion and Foster–Miller's progress in modifying CECIL. Malaugh believed that St. Louis's experience with the Candu boiler would provide useful insight. Before Foster–Miller would give permission for St. Louis to attend, it insisted that BWC sign a standard form Foster–Miller confidentiality and nondisclosure agreement covering proprietary aspects of CECIL. The agreement was signed by William Schneider, the Manager of BWC's Engineering Services, and faxed to Foster–Miller several minutes before the meeting began. The agreement did not purport to define as proprietary any information that had already made its way into the public domain or had been previously disclosed by Foster–Miller on an unrestricted basis. It does not appear from the evidence that Malaugh, Ontario Hydro, or the Candu Owners' Group were asked to sign similar agreements.

8. The meeting lasted several hours. Discussion of Foster–Miller's progress in redesigning the flexible lance was confined to a twenty minute presentation by Leary. Leary described how he had come to select a nylon conduit hose reinforced with double wrapped Kevlar. Leary also displayed a cross section of the redesigned conduit. Although both Malaugh and St. Louis asked questions, the specifications of the hose (the diameter, the angle of the Kevlar weave, the denier of the strands, and their urethane coating) did not figure in the discussion. Leary did not consider the concept of reinforcing nylon with Kevlar a novel idea. Leary rather regarded the fittings, on which he was still at work, as his unique contribution to the project.

9. Both St. Louis and Malaugh were aware prior to the meeting that Foster–Miller had chosen a Kevlar wrapped nylon hose conduit for its lance. In response to a question from St. Louis, Leary identified U.S. Composites as Foster–Miller's hose supplier. St. Louis, in fact, had obtained a sample of Foster–Miller's hose prior to the May 11 meeting, probably from Schneider, who was likely to have known the identity of the manufacturer. (Murray Latimer, a BWC employee, received a piece of the hose from St. Louis bearing a U.S. Composites tag indicating that the hose had been manufactured as part of the initial batch delivered to Foster–Miller on April 3). Sometime after the May meeting, St. Louis called U.S. Composites and asked to buy additional hose, stating that he had the permission of Foster–Miller to do so. On instructions from Foster–Miller, U.S. Composites refused to fill the order.[1] In the fall of 1990, St. Louis and Latimer performed bursting strength tests on the three inch sample of the hose that St. Louis had in his possession.

10. On May 18, 1990, Foster–Miller circulated an April progress report on the CECIL Canada project to some fifteen individuals and entities designated by Ontario Hydro. Most of the recipients were unknown to Foster–Miller. On May 9, 1990, Paul Belkus, Foster–Miller's Program Manager, signed an internal Foster–Miller clearance sheet indicating that the April report contained no proprietary information. The report disclosed that:

> The primary hose section will consist of a double wrap of Kevlar® fiber, which will increase the burst strength of the hose from 15,000 to 30,000 psi. A hose with a double wrap was ordered and received. It will be tested as part of the mechanical fitting evaluation tests.

The report itself did not bear any proprietary marks or designations.

11. In 1992, while Lee was visiting Pickering Unit 5, one of Ontario Hydro's reactors, he observed a BWC lance lying on the floor of the reactor's platform. Unlike the rigid BWC lances with which Lee was familiar, this lance was of a flexible design that appeared suspiciously similar to Foster–Miller's. That BWC had succeeded in developing a flexible lance was among the factors that led Ontario Hydro to award BWC the servicing contract over Foster–Miller.

12. Foster–Miller considers the method of construction of its prototypical lance conduit as proprietary. Specifically, Foster–Miller points to the internal dimensions of the hose, the technique of coating each strand of Kevlar with urethane, and the angle of the Kevlar weave, as constituting in combination a trade secret. Foster–Miller concedes that the concept of using Kevlar as a reinforcement medium had no proprietary significance in May of 1990. The hosing for BWC's flexible lance differs from Foster–Miller's in the angle of the Kevlar weave, its denier, lack of urethane coating, and the choice of fittings. It is similar in its use of a double wrapped Kevlar sheathing.

## CONCLUSIONS AND RULINGS OF LAW

■ Plaintiff asserts personal jurisdiction in this case under the transacting business provision of the Massachusetts Long Arm Statute, G.L. c. 223A, § 3(a). Jurisdiction is conferred by the Statute "when some basis for jurisdiction enumerated in the statute has been established" and when "the exercise of jurisdiction under State law [is] consistent with basic due process requirements mandated by the United States Constitution." *Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1, 5–6, 389 N.E.2d 76 (1979). Under § 3(a) "the facts must satisfy two requirements—the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). "[A]n assertion of jurisdiction must [also] be tested for its reasonableness, taking into account such factors as the burden on the defendant of litigating in the plaintiff's chosen forum, the forum State's interest in adjudicating the dispute,

---

**1.** In a Declaration filed after the hearing, Hugo Kruesi of U.S. Composites swore that he has no record indicating that St. Louis (or anyone else from BWC) was supplied with a sample of the hose *after* the May 11 meeting.

and the plaintiff's interest in obtaining relief." *Tatro*, supra at 773, 625 N.E.2d 549 (citing *United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 987 F.2d 39, 46–47 (1st Cir.1993)).

◾ The transacting business test is very liberally construed. It "embrace[s] any purposeful acts performed in Massachusetts whether personal, private, or commercial." *Johnson v. Witkowski*, 30 Mass.App.Ct. 697, 713, 573 N.E.2d 513 (1991). See *Carlson Corp. v. University of Vermont*, 380 Mass. 102, 105, 402 N.E.2d 483 (1980) (contract for work to be performed outside of Massachusetts); *Tatro*, supra 416 Mass. at 770, 625 N.E.2d 549 (confirmation of out-of-state hotel reservation); *Good Hope Indus.*, supra (solicitation of business); *Haddad v. Taylor*, 32 Mass.App.Ct. 332, 335, 588 N.E.2d 1375 (1992) (use of the telephone and mails). It is clear under Massachusetts law that anything but the most incidental commercial contact with a Massachusetts resident is sufficient to satisfy the transacting business test. The purposeful attendance by St. Louis at the Waltham briefing and the transmission of the confidentiality agreement to Massachusetts by fax are sufficient to meet the first component of the test.

As to the second component, that the plaintiff's claim must "arise from" the contact, Massachusetts adheres to a similarly liberal construction, preferring a "but for" or "train of events" test to the more restrictive proximate cause test articulated by the First Circuit. See *Tatro*, supra 416 Mass. at 769–771, 625 N.E.2d 549. Compare *Marino v. Hyatt Corp.*, 793 F.2d 427, 428–430 (1st Cir. 1986). However, even applying the more generous Massachusetts standard, I cannot find that Foster–Miller has established the probability that "but for" BWC's presence at the May 11, 1990, meeting in Waltham, its injury (if any) would not have occurred or that a sequence of events was set into motion that ultimately caused harm to Foster–Miller.

◾ I base this conclusion on the following. Plaintiff has failed to show any probability that proprietary aspects of the construction of the modified lance hose were in fact discussed at the Waltham meeting. What does appear to have been discussed were aspects of Leary's work that Foster–Miller chose freely to disseminate both before and after the May 11 meeting, most notably in the April progress report.[2] The only arguably proprietary detail that Leary appears to have touched upon was the identity of Foster–Miller's hose supplier, something that BWC (either St. Louis or Schneider) already knew. (Foster–Miller concedes that there was nothing proprietary about the use of Kevlar as a reinforcement medium). While the concept of what constitutes a trade secret is broadly defined under Massachusetts law, it does not encompass that which is or has been allowed to become part of the public domain. Cf. *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 852–853 (1st Cir.1985).[3] Moreover, the flexible lance eventually developed by BWC does not appear to incorporate any feature of Leary's design other than the use of a double wrapped Kevlar sheath. This fact alone might be dispositive of the entire case but for BWC's inexplicable refusal to permit Foster–Miller to examine one of its flexible lances prior to the hearing. This reluctance leads me to suspect that BWC has something to hide, and that that something may very well be an injury to Foster–Miller. What I do not have is any evidence that the harm (if any) flowed from the Waltham meeting. While mystery surrounds the exact circumstances in which St. Louis obtained the sample of Foster–Miller's hose, it seems probable that it came into his possession before the May 11 meeting. There is no

---

**2.** Paul Belkus, the Project Manager who prepared and released the report, insisted that he made a mistake in checking the box on Foster–Miller's clearance sheet indicating that all material in the report was non-proprietary. After examining the careful construction of the sheet, and considering Belkus's familiarity with its use, I find it improbable that such a mistake could have been made.

**3.** Because I do not find it probable that aspects of Foster–Miller's "methodology" in developing the hose were discussed at the Waltham meeting, I do not address defendant's argument that a "methodology" cannot be given the status of a trade secret. Cf. *Energy Resources Corp. v. Porter*, 14 Mass.App.Ct. 296, 302–303, 438 N.E.2d 391 (1982).

evidence that St. Louis or any other BWC employee made a trip to Massachusetts prior to May 11 for any purpose, much less a burglarious one, while there is evidence that no Foster–Miller hose was acquired by BWC after May 11. The inference is thus compelling that St. Louis or Schneider acquired the hose from an employee of U.S. Composites, a New York company, prior to May 11.

▮ Even were I to find the probability that some harm had flowed to Foster–Miller from the Waltham meeting, I would allow the motion to dismiss out of considerations of due process. Where a plaintiff has established that a defendant has purposefully established such minimum contacts with a forum state that it can expect to be haled into that state's courts, still "the exercise of personal jurisdiction over the defendant must comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). In assessing whether an assertion of personal jurisdiction satisfies due process, a district court, in this Circuit, is directed to weigh certain "Gestalt" factors. These are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." *United Elec. Workers*, supra 987 F.2d at 46.

With respect to the first factor, the choice of Massachusetts as a forum imposes only a slight hardship on the defendant. BWC is an established, profitable corporation with access to capable lawyers in Massachusetts. The fact that for the majority of witnesses Canada is the more convenient forum is a reason, but not a compelling one, to prefer Canada. The second factor weighs heavily in favor of the choice of Canada. While Massachusetts has a substantial interest in protecting the intellectual property of its citizens, the implications of this litigation for a Canadian industry upon whom an entire population depends for electric power dwarf the more general Massachusetts concerns. This lawsuit raises no novel issues the resolution of which would impact upon or alter Massachusetts law, nor would the consequences of a decision adverse to Foster–Miller impact any Massachusetts resident other than Foster–Miller. Consideration of the third factor, the plaintiff's interest in convenient and effective relief, also weighs in favor of the selection of Canada. It goes without saying that it is more convenient for the plaintiff to litigate this matter in domestic comfort. But only slightly more so. Plaintiff does business in Canada and is represented by presumably capable Canadian attorneys. On the other hand, this court is unable to award plaintiff the full measure of relief that it seeks. The court can award monetary damages. But with respect to injunctive relief and the vindication of plaintiff's Canadian patent rights, a district court is cautioned to exercise its powers "with great reluctance when it will be difficult to secure compliance with any resulting decree or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir.1956) (not the province of a United States district court to determine the validity of a trade-mark protection accorded by the Dominion of Canada). See also Wright & Miller, Federal Practice and Procedure: Civil § 2945. As for the last two factors, both Canada and Massachusetts share the same substantive concerns for the protection of property rights, while Canada, where the impact of the decision will be disproportionately felt, has the more immediate policy interests at stake. Finally, although not one of the explicit "Gestalt" factors, there is no reason to believe that a Canadian court would be biased against either party for reasons of parochial interest, would be any less solicitous of the substantive rights of the parties, or would, where necessary, prove any less capable of applying the law of Massachusetts than would a court of the United States in applying Canadian law. See *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 952 (1st Cir.1991).[4]

4. The resolution that I have reached does not

require that I address defendant's alternative

## ORDER

For the foregoing reasons, BWC's motion to dismiss for lack of personal jurisdiction is *ALLOWED*.

SO ORDERED.

ground of dismissal for reasons of forum non conveniens. Although the defendant bears the burden of showing forum non conveniens, I note that the considerations at play are largely the same as those fielded by the "Gestalt" test.