**FOSTER–MILLER, INC.,**
**Plaintiff, Appellant,**

v.

**BABCOCK & WILCOX CANADA,**
**Defendant, Appellee.**

**No. 94–1498.**

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1994.

Decided Feb. 9, 1995.

---

James J. Foster, with whom Michael A. Diener and Wolf, Greenfield & Sacks, P.C., Boston, MA, were on brief, for appellant.

Peter L. Resnik, with whom Cherie L. Krigsman and McDermott, Will & Emery, Boston, MA, were on brief, for appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

In *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671 (1st Cir.1992), we urged district courts to take a flexible approach in handling motions to dismiss for lack of *in personam* jurisdiction, and, concomitantly, to tailor procedures for use in those purlieus. Turning from the general to the particular, we recommended that district courts employ varying levels of scrutiny in connection with such motions, adapting the level of scrutiny to the exigencies of the individual case. *See id.* at 674–78. Among other possibilities, we suggested using a special intermediate standard when "factual issues are common to both the jurisdictional question and the claim on the merits...." *Id.* at 677.

The case before us today—an appeal by Foster–Miller, Inc. (FMI) from an order dismissing its commercial tort action against Babcock & Wilcox Canada (BWC)—illustrates vividly that *Boit*'s flexible approach demands circumspection in its application. In this case, the district court applied *Boit*'s intermediate standard too rashly when, eager to test whether a legally sufficient showing of jurisdiction had been made, it neither gave the parties adequate notice that it intended to use this special standard nor ensured that FMI had a fair opportunity to gather and present the evidence necessary for such a showing. While we are not without sympathy for the district judge—he inherited this case midstream, and *Boit,* in retrospect, should have emphasized the need to forewarn litigants of a trial court's intention to go

beyond the prima facie standard typically associated with motions to dismiss under Fed.R.Civ.P. 12(b)(2)—we cannot permit the dismissal order to stand.

## I. THE FACTS

We sketch the operative facts, drawing liberally from the lower court's opinion. *See Foster–Miller, Inc. v. Babcock & Wilcox Can.*, 848 F.Supp. 271 (D.Mass.1994).

The parties to this appeal are quondam competitors: FMI is a Massachusetts corporation engaged in furnishing sludge and particle removal services for nuclear steam generators; BWC is a Canadian firm that, among other things, services such generators. At its core, the litigation concerns a virtual meltdown of the parties' relationship, which in turn detonated a lawsuit. The tale follows.

As early as 1988, FMI and BWC entertained the prospect of a joint venture to furnish sludge removal services to Ontario Hydro, a Canadian utility. Although the joint venture idea stalled and the principals went their separate ways, Canada remained an alluring target. But the road to prosperity had a large pothole. FMI's then-extant technology, known by the acronym "CECIL," featured flexible lances that directed powerful bursts of water at pockets of sludge found within the hard-to-reach crannies of nuclear steam boilers. While this system had distinct competitive advantages over BWC's rival rigid lance system, neither system performed satisfactorily in the cleansing of Canadian boilers (known in the trade as Candu boilers).

Determined to detour around the "can't do Candu" pothole and penetrate the Canadian market, BWC set out to design a lance of unprecedented flexibility. In 1989, while BWC's development efforts were underway, Ontario Hydro (acting on behalf of a consortium of Canadian utilities) retained FMI to study the feasibility of adapting FMI's flexible lance technology for use in Candu boilers. As part of this endeavor, FMI contracted with a well-known supplier, U.S. Composites (CompCo), to create a new type of hose.

In March 1990, Robert A.S. Lee, an FMI employee who had been instrumental in perfecting CECIL, attended an industry conference in Tennessee. Daniel St. Louis, a BWC engineer involved in that company's push to fashion a flexible lance, attended the same session. During a previous encounter, the men had casually discussed high pressure hoses. On this occasion, their conversation became more detailed and focused on the possibility of reinforcing high pressure hoses with certain fibers. The discussion proved prophetic: a few weeks thereafter, CompCo delivered the special hose that FMI had asked it to design. The hose was thought in certain quarters to represent a technological breakthrough. One of its more revolutionary features was a double-layered Kevlar sheath that supplied desired reinforcement.

On May 11, 1990, an Ontario Hydro representative, James Malaugh, traveled to FMI's plant in Waltham, Massachusetts, to assess FMI's progress. Seeking expertise and insight, Malaugh invited St. Louis to join him. Nonplussed, FMI allowed St. Louis to attend only after BWC signed a confidentiality agreement. The agreement, duly executed by a ranking official of BWC and transmitted via facsimile machine from Canada, acknowledged that FMI "anticipate[d] disclosing ... certain information of a novel, proprietary, or confidential nature," and memorialized BWC's promise "not to use [the] information for any purpose unless specifically authorized in writing by FMI." The agreement also stipulated that FMI would be entitled to relief for any breach.

William Leary, the FMI engineer in charge of the Ontario Hydro project, hosted the Waltham session. The participants debated various aspects of flexible lance technology, including the preferred characteristics of the hose and possible methods of reinforcement. At one point Leary, responding to a direct question by St. Louis, identified CompCo as FMI's supplier. Not long after the Waltham meeting, St. Louis contacted CompCo and inquired about the possibility of that company fabricating a similar hose for BWC. St. Louis' suggestion that FMI would not object proved overly san-

guine; after consulting with FMI, CompCo rebuffed BWC's overtures.[1]

Undaunted, BWC forged ahead in its research effort. It eventually succeeded in manufacturing its own flexible lance, suitable for Candu boilers. Thereafter, Ontario Hydro awarded BWC a lucrative contract.

## II. THE LITIGATION

On November 12, 1993, FMI, claiming to have gotten hosed, commenced suit against BWC in the United States District Court for the District of Massachusetts. Invoking diversity jurisdiction, 28 U.S.C. § 1332 (1988), FMI charged breach of the confidentiality agreement, misappropriation of trade secrets, and unfair competition. BWC moved to dismiss for lack of *in personam* jurisdiction or, in the alternative, on the basis of *forum non conveniens.*

Judge Keeton drew the case. Concerns about the parties' trade secrets slowed discovery to a crawl. At a conference held on December 16, 1993, Judge Keeton scheduled a hearing on the motion for January 4, 1994, restricted discovery for the time being to matters "bear[ing] upon the jurisdictional issue," and advised counsel that, absent an agreement dissolving the discovery deadlock, he would use the traditional prima facie standard, not the special intermediate standard, in evaluating the motion to dismiss.

At that point, fate intervened. In a routine shuffling of cases ancillary to the appointment of several new judicial officers, this case was plucked from Judge Keeton and reassigned to Judge Stearns. The January 4 hearing never materialized. Instead, Judge Stearns heard the motion to dismiss on February 1 and 2, 1994. Though the discovery dispute had not been resolved, Judge Stearns, to FMI's obvious chagrin, undertook not only to probe the existence of the basic facts on which jurisdiction might be premised but also to adjudicate certain ultimate facts (*e.g.*, whether the participants ac-

tually disclosed any confidential information at the Waltham meeting).[2] And he applied the special intermediate level of scrutiny rather than the more easily satisfied prima facie standard.

The district court granted the motion to dismiss. After stressing the importance of the Waltham meeting to the jurisdictional issue—BWC, after all, had no other significant contacts with the forum—Judge Stearns articulated two bases for refusing to exercise jurisdiction. First, he found it unlikely either that proprietary information had been disclosed at the meeting or that such information came into BWC's possession as a result of the meeting; therefore, FMI's cause of action did not arise from BWC's participation in the meeting as required by the Massachusetts long-arm statute. *See Foster–Miller,* 848 F.Supp. at 276–77. Second, and alternatively, the judge concluded that, even if FMI's claims did arise from BWC's participation in the Waltham meeting, it would be unreasonable for a Massachusetts-based court to exercise jurisdiction over BWC, in part because the court might not be able to grant effective injunctive relief. *See id.* at 277.

FMI moved for reconsideration, specifically withdrawing its prayer for an injunction. Judge Stearns denied the motion without comment. This appeal ensued.

## III. SPECIFIC PERSONAL JURISDICTION

Prior to reexamining the *Boit* framework, we rehearse certain general principles of law relating to specific *in personam* jurisdiction.

Personal jurisdiction implicates the power of a' court over a defendant. In a federal court, both its source and its outer limits are defined exclusively by the Constitution. *See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S.

---

**1.** Nonetheless, BWC managed to obtain a sample of the special hose. The parties dispute whether this occurred before or after the May 11 meeting.

**2.** Because the scope of this inquiry caught FMI off guard, it tendered a series of post-hearing offers of proof in an effort to make up lost

ground. We do not comment on the timing of FMI's proffers. Further proceedings in the district court are obligatory, *see infra* Parts IV(C) & V, at which time new evidentiary submissions can be assembled.

694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982).

There are two different avenues by which a court may arrive at personal jurisdiction. One frequently traveled route leads to general jurisdiction. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992) (*Pleasant St. I* ). Here, BWC's forum-related contacts are far too scanty to justify the invocation of general jurisdiction. *See Foster–Miller,* 848 F.Supp. at 273 (marshalling certain undisputed facts).

When general jurisdiction is lacking, the lens of judicial inquiry narrows to focus on specific jurisdiction. As the label implies, this focus requires weighing the legal sufficiency of a specific set of interactions as a basis for personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 & nn. 8–9, 104 S.Ct. 1868, 1872 & nn. 8–9, 80 L.Ed.2d 404 (1984) (recognizing "general" and "specific" jurisdiction and distinguishing between them); *Pleasant St. I,* 960 F.2d at 1088 (similar); *Donatelli v. National Hockey League,* 893 F.2d 459, 462–63 (1st Cir.1990) (similar). In that exercise, the applicable constitutional limits assume critical importance. We explain briefly.

The existence of specific personal jurisdiction depends upon the plaintiff's ability to satisfy two cornerstone conditions: "first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." *Pritzker v. Yari,* 42 F.3d 53, 60 (1st Cir. 1994); *see also Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 204 (1st Cir.1994); *Hahn v. Vermont Law Sch.,* 698 F.2d 48, 51 (1st Cir.1983).

Although we deem the first of the cornerstone conditions to be self-explanatory, the second condition requires amplification. This condition implicates three distinct components, namely, relatedness, purposeful availment (sometimes called "minimum contacts"), and reasonableness: [3]

First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Pleasant St. I,* 960 F.2d at 1089; *accord Pritzker,* 42 F.3d at 60–61; *Ticketmaster,* 26 F.3d at 206.

## IV. APPLYING THE JURISDICTIONAL RULES

A long-arm statute is plainly available for FMI's use. *See* Mass.Gen.L. ch. 223A, § 3(a) (1992). Section 3(a), quoted *supra* note 3, is not modest in its reach. Its language is expansive, and its words are to be generously applied in order to determine whether a given defendant fairly can be said to have participated in the forum's economic life. *See Pleasant St. I,* 960 F.2d at 1087 (collecting cases). Since section 3(a) applies here, we

---

**3.** This trilogy forms an interesting contrast with the jurisprudence of the branch of the Massachusetts long-arm statute that applies in many business disputes. *See* Mass.Gen.L. ch. 223A, § 3(a) (1992) (providing in relevant part for the exercise of "personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... transacting any business" in Massachusetts). The Massachusetts Supreme Judicial Court has held that, to animate the statute, the facts must show both that the defendant transacted business in Massachusetts, and that the plaintiff's claim arises out of the transaction of that business. *See Tatro v. Manor Care, Inc.,* 416 Mass. 763, 625 N.E.2d 549, 551 (1994); *Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 389 N.E.2d 76 (1979). From our coign of vantage, these two requirements appear to correspond, in reverse order, to the first two of the three constitutional components, *i.e.,* the "transacting any business" requirement corresponds to "minimum contacts," while the "arising from" requirement corresponds to relatedness.

turn directly to the second of the two corner-stone conditions that constitute the foundation for a finding of specific *in personam* jurisdiction.

■ As we have said, the condition comprises three components. The first—minimum contacts—is not legitimately in issue. The seminal jurisdictional fact—that BWC voluntarily dispatched a representative to Massachusetts for commercial advantage pursuant to a written contract with a Massachusetts firm—cannot be gainsaid. In taking this action, BWC purposefully conducted activities in the forum state, thereby making a suit foreseeable. *See id.* at 1089. Hence, we endorse the district court's conclusion that BWC transacted business in Massachusetts to such an extent, and in such a manner, as to satisfy the minimum contacts requirement. *See Foster–Miller,* 848 F.Supp. at 276; *compare Pritzker,* 42 F.3d at 62 (finding jurisdiction in part because the nonresident defendant, by contract, had "knowingly acquir[ed] an economically beneficial interest" in a forum-based commercial venture).

Setting the matter of minimum contacts to rest, we come face to face with the next component: relatedness. In this case, evaluating that requirement reduces to whether FMI's claim arises from BWC's minimum contacts. To place this issue into proper perspective, we first limn the options that are available to a district court in handling a motion to dismiss for want of jurisdiction over the person. We then refine that framework and scrutinize the decision below in light of our handiwork.

### A. *Establishing and Testing Personal Jurisdiction.*

■ It is apodictic that the plaintiff, who bears the burden of proving the existence of *in personam* jurisdiction, must carry the devoir of persuasion on the elements of relatedness and minimum contacts. *See Ticketmaster,* 26 F.3d at 207 n. 9; *Martel v. Stafford,* 992 F.2d 1244, 1247 n. 5 (1st Cir.1993); *Donatelli,* 893 F.2d at 468. But this is merely one step along the path; to allocate the burden is neither to define the evidentiary showing necessary to meet it nor to explain whether that showing varies from context to context.

We addressed these important issues in *Boit.* There, we tried to formulate a procedural matrix that would serve to endow the decisional process with appropriate degrees of economy and manageability. That endeavor produced a trio of standards, each corresponding to a level of analysis, that might usefully be employed when a trial court comes to grips with a motion to dismiss for want of personal jurisdiction.

■ The most conventional of these methods permits the district court "to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit,* 967 F.2d at 675. To make a prima facie showing of this calibre, the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts. *See id.* Withal, the district court acts not as a factfinder, but as a data collector. That is to say, the court, in a manner reminiscent of its role when a motion for summary judgment is on the table, *see* Fed. R.Civ.P. 56(c), must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing. Despite the lack of differential factfinding, this device is a useful means of screening out cases in which personal jurisdiction is obviously lacking, and those in which the jurisdictional challenge is patently bogus. However, the approach offers little assistance in closer, harder-to-call cases, particularly those that feature conflicting versions of the facts. *See, e.g., General Contracting & Trading Co. v. Interpole, Inc.,* 899 F.2d 109 (1st Cir.1990).

■ A second option open to the court is to embark on a factfinding mission in the traditional way, taking evidence and measuring the plaintiff's jurisdictional showing against a preponderance-of-the-evidence standard. In *Boit,* we stated that this standard may appropriately be invoked when a court

determine[s] that in the circumstances of a particular case it is unfair to force an out-

of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam* jurisdiction. A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradictions, or when a plaintiff's affidavits are "patently incredible...."

*Boit,* 967 F.2d at 676 (offering examples). Virtually by definition, the preponderance standard necessitates a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial.[4] In that mode, the court will "consider[ ] all relevant evidence proffered by the parties and mak[e] all factual findings essential to disposition of the motion." *Id.* But this method must be used discreetly. For one thing, pretrial evidentiary hearings are relatively cumbersome creatures, and, if used routinely, can squander judicial resources. For another thing, since this method contemplates a binding adjudication, the court's factual determinations ordinarily will have preclusive effect, and, thus, at least in situations in which the facts pertinent to jurisdiction and the facts pertinent to the merits are identical, or nearly so, profligate use of the preponderance method can all too easily verge on a deprivation of the right to trial by jury.

■ In *Boit,* we recognized these difficulties. We also recognized that the prima facie and preponderance-of-the-evidence standards are merely two of several possible models, and that trial courts need not confine themselves to choosing between these two levels of evidentiary scrutiny. *See id.* at 677. In the special circumstance in which the assertion of jurisdiction is bound up with the claim on the merits, the possibility of preclusion renders use of the preponderance standard troubling, while the possibility of permitting a dubious case to proceed beyond the pleading stage, and even to trial, though the court eventually will be found to lack jurisdiction, renders use of the prima facie standard undesirable.

■ The *Boit* panel anticipated that, when this special circumstance arose, trial courts might steer a middle course by engaging in some differential factfinding, limited to probable outcomes as opposed to definitive findings of fact, thereby skirting potential preclusionary problems while at the same time enhancing the courts' ability to weed out unfounded claims of jurisdiction. Utilizing this intermediate standard, a district court, "even though allowing an evidentiary hearing and weighing evidence to make findings ... may merely find whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Id.* This showing constitutes an assurance that the circumstances justify imposing on a foreign defendant the burdens of trial in a strange forum, but leaves to the time of trial a binding resolution of the factual disputes common to both the jurisdictional issue and the merits of the claim. *See id.* at 678.

Unlike the prima facie standard, and like the preponderance standard, this third method, which we sometimes call the "likelihood standard,"

> involves factfinding rather than merely making a ruling of law regarding sufficiency of the evidence to present a fact question. Like the first and unlike the second method, however, the third method avoids potentially troubling issues of "issue preclusion" or "law of the case" (at least when the court denies the motion) because a determination by such an intermediate standard ... does not purport to be a finding by the same standard on the same issue as will be decided at trial.

*Id.*

We acknowledge that having an array of standards at the ready may be thought too much of a good thing. However, even though an intermediate standard will not be used with great frequency, the need for one is manifest. We can postulate a variety of

---

4. Such hearings frequently are convened under the aegis of Fed.R.Civ.P. 12(d), which provides in pertinent part that certain defenses, including the defense of lack of *in personam* jurisdiction, "shall be heard and determined before trial on application of any party," unless the court orders a deferral until time of trial.

"common facts" scenarios in which the facts necessary to sustain personal jurisdiction are intimately bound up with facts necessary to establish the merits of the underlying claim. *See, e.g.,* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L.Rev. 234, 247–51 (1983) (noting, though not adequately resolving, the problem created in situations where proving the facts "upon which jurisdiction depends is viewed as inextricably tied to the substantive merits of the case"). It is precisely because of the incidence of these situations—situations in which the issue of jurisdiction is factually enmeshed with the merits of the suit—that we recognized in *Boit* the need for an intermediate standard of proof and, correspondingly, an intermediate standard of judicial analysis.

### B. *Standards of Review.*

■ We are reluctant to end our discussion of the methods available to district courts for testing jurisdictional waters without mentioning appellate review. As a practical matter, the standard of review will depend in the first instance on whether the court of appeals is reviewing the district court's choice of an analytic method or its application of such a method. As for the court's initial choice from among the three standards we have discussed—prima facie, likelihood, or preponderance—appellate review is de novo. This accords with the general principle that a trial court's determinations as to the legal rules that govern a party's proof, including those that dictate what quantum of proof the law requires, are subject to plenary review. *See, e.g., Putnam Resources v. Pateman,* 958 F.2d 448, 471 (1st Cir.1992); *see also Soto v. United States,* 11 F.3d 15, 17 (1st Cir.1993) (holding that "if a district court applie[s] an erroneous legal standard to the facts," de novo review obtains).

■ As for the district court's subsequent application of the method that it chooses, the standard of review will vary from method to method. If the district court employs the prima facie standard, then appellate review is de novo. *See United Elec.*

*Workers v. 163 Pleasant St. Corp.,* 987 F.2d 39, 44 (1st Cir.1993) (*Pleasant St. II* ); *Boit,* 967 F.2d at 675; *see also Garita Hotel Ltd. Partnership v. Ponce Fed. Bank,* 958 F.2d 15, 17 (1st Cir.1992) (explaining that appellate courts traditionally review rulings on motions to dismiss de novo, "applying the same criteria that obtained in the court below"). If the district court departs from the conventional method of adjudicating motions to dismiss and relies upon the preponderance-of-the-evidence standard to determine the existence *vel non* of personal jurisdiction, then appellate review is for clear error. *See CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364–65 (2d Cir.1986); *see also* Fed. R.Civ.P. 52(a).

■ If the district court employs the intermediate standard, then appellate review is for abuse of discretion. *Cf. Boit,* 967 F.2d at 678 (suggesting a deferential standard of appellate review). Two considerations point to the applicability of this deferential mode of review in this situation. First, the nature of a likelihood analysis is such that it falls naturally within the realm of discretionary decisionmaking. Second, from a practical standpoint, a likelihood analysis simply does not seem amenable to either of the other standards. Unlike the classic motion to dismiss, in which the plaintiff's assertions are accepted as true, a likelihood analysis requires the judge to pass upon the accuracy and integrity of the plaintiff's assertions. Yet, in contrast to a preponderance-of-the-evidence analysis, these determinations are not true findings of fact, for they lack definiteness to some degree, and they also lack the preclusive quality that would otherwise normally attach. Consequently, we believe that abuse of discretion is the proper standard of review. In practical terms, this means that we will set aside the challenged ruling only if we descry "a meaningful error in judgment." *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988); *accord Rosario–Torres v. Hernandez–Colon,* 889 F.2d 314, 323 (1st Cir. 1989) (en banc).

■ Of course, whatever method is chosen and however it may be applied, appellate review of the trial court's legal conclusions about whether its findings do—or do not—

support the exercise of *in personam* jurisdiction is always nondeferential and plenary. *See Boit,* 967 F.2d at 678.

## C. *Applying the Likelihood Standard.*

After convening an evidentiary hearing and bringing the likelihood standard to bear, Judge Stearns found it unlikely either that FMI disclosed legally protected information at the Waltham meeting or that BWC obtained confidences as a consequence of the meeting. *See Foster–Miller,* 848 F.Supp. at 276–77. FMI assigns error. Its appeal raises potentially difficult questions about the application of *Boit*'s likelihood standard in certain types of cases.

We hasten to note that the paradigm case—involving the use of *Boit*'s intermediate standard as a basis for *exercising* jurisdiction, *i.e.,* as a basis for *denying* a motion to dismiss—hardly seems problematic. In such a scenario, the plaintiff is permitted to proceed in its forum of choice, yet the defendant has the consolation of having been afforded a detailed demonstration, beyond a mere prima facie showing, of why the court deems it fair to exercise jurisdiction, at least provisionally. It is only when *Boit*'s intermediate standard is used as a basis for *declining* the exercise of jurisdiction, *i.e.,* as a basis for *granting* a motion to dismiss, that the prospect of mischief looms. One can easily imagine cases in which the likelihood standard might be applied to adjudicate facts that are only marginally related to jurisdiction, or are very closely related to the merits of the plaintiff's substantive claims, thus prematurely extinguishing a plaintiff's ability to present its case in a full and fair manner.[5]

■ The short of it is that, whatever its merits in the abstract, *Boit*'s intermediate standard requires caution in its application, especially when it appears that a dismissal may result. Indeed, although *Boit* does, in dictum, 967 F.2d at 677–78, propose to authorize such dismissals, it is noteworthy that,

apart from the opinion of the court below, there is no other reported case, *Boit* included, that has sanctioned a dismissal pursuant to a district court's use of the likelihood standard.

In general, this is as it should be. To the limited extent that dismissals under *Boit*'s intermediate standard are justified at all, they will happen only rarely. Even then, the exact bounds of permissible application may not always be evident. Nonetheless, we believe it is better to tolerate the inconvenience of mild doctrinal uncertainty rather than to forgo altogether the utility of an intermediate standard and method of analysis. *See generally* Stephen L. Carter, *Constitutional Adjudication and the Indeterminate Text: A Preliminary Defense of an Imperfect Muddle,* 94 Yale L.J. 821 (1985) (recognizing the impossibility of removing all uncertainty from legal doctrine); Oliver Wendell Holmes, Jr., *The Path of the Law,* 10 Harv.L.Rev. 457, 465 (1897) (warning that, in respect to judicial decisions, "certainty generally is illusion, and repose is not the destiny of man"). The bottom line, clearly, is that judges employing *Boit*'s intermediate standard should proceed with great care.

■ In any event, these potential difficulties are peripheral to the instant appeal. In this instance, the flaw is less Judge Stearns' initial decision to switch the signals previously given by Judge Keeton and instead apply the intermediate standard, but more his failure to apprise FMI squarely of this change of plan—a failure that was aggravated by FMI's inability to engage in appropriate discovery and then to present the totality of its evidence within the context of a likelihood analysis.

■ When judges elect on their own initiative to use innovative methods in an effort to accelerate the progress of a case, they must take pains to ensure that parties are given satisfactory notice, reasonable access to discovery, and a meaningful opportunity to

---

**5.** Conceivably, such an adjudication may also serve to thrust the judge into a role that, depending upon the circumstances, more appropriately belongs to the jury. *See, e.g., Jacob v. City of New York,* 315 U.S. 752, 756, 62 S.Ct. 854, 856, 86 L.Ed. 1166 (1942) (noting basic principle that

merely because a "case is close and a jury might find either way ... is no reason for a court to usurp the function of the jury"); *Nunes v. Farrell Lines, Inc.,* 227 F.2d 619, 621–22 (1st Cir.1955) (applying principle of *Jacob* and vacating directed verdict).

present evidence. *See, e.g., Stella v. Town of Tewksbury*, 4 F.3d 53, 55–56 (1st Cir.1993) (stating these principles in the context of *sua sponte* summary judgment); *Jardines Bacata, Ltd. v. Diaz–Marquez*, 878 F.2d 1555, 1560–61 (1st Cir.1989) (similar). While the likelihood standard has value, the latent risks associated with its use are not insignificant, and they should be ameliorated to the extent practicable.

Here, the lower court did not afford FMI the process that was due. To be sure, Judge Stearns advised counsel at a status conference on January 20, 1994, that he was pondering the use of the likelihood standard, but he neither eased the existing restriction on discovery nor superseded Judge Keeton's prior directives. The prima facie standard remained the default setting, and Judge Stearns' intentions remained open to conjecture until the day of the hearing. Indeed, while the court transmitted mixed signals to some degree, it closed the January 20 conference by specifically announcing that the question of misappropriation would *not* be subject to anything more rigorous than scrutiny under a prima facie standard. On this point, Judge Stearns' intention could not have been more explicit. He told the lawyers: "I am going to, for purposes of this hearing, ... basically accept whatever [FMI] allege[s] to be true in terms of the misappropriation."

Following this pronouncement, the court never gave the litigants suitable forewarning of a change of heart, or of the extent to which it would apply the likelihood standard. To understand the gravity of this omission, it is important to understand the restriction imposed on discovery by Judge Keeton, and how that restriction arose. On December 15, 1993, FMI moved "to examine the documents and other materials maintained by BWC which would be relevant to statements in the affidavits of Mr. St. Louis and others con-

cerning contacts with, statements made by, and other information received from Foster–Miller...." BWC objected. The next day Judge Keeton, ruling *ore tenus*, restricted FMI's discovery to matters "bear[ing] upon the jurisdictional issue." All other discovery, he ruled, was "out of bounds" for the time being. We think that this limitation, coupled with the judge's simultaneous indication that he would evaluate the motion to dismiss under the prima facie standard, effectively prevented FMI from engaging in merits-related discovery. And when Judge Stearns then shifted abruptly from the forecasted prima facie standard to the more intrusive likelihood standard, the preexisting restriction—which remained intact on Judge Stearns' watch—hamstrung FMI.[6]

Since this imperfect communication obviously prejudiced FMI's ability fairly to meet the rigors that an across-the-board use of the likelihood standard imposed in the circumstances of this case, we must set aside the court's conclusion that FMI's suit did not "arise from" BWC's activities in the forum state. To that extent, then, the dismissal order succumbs.

## V. ASSESSING REASONABLENESS

Our odyssey is not yet at an end. In addition to holding that FMI's claim did not arise from BWC's in-forum contacts, the district court held, alternatively, that it would be unreasonable to exercise jurisdiction over BWC. *See Foster–Miller*, 848 F.Supp. at 277; *see generally Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–16, 107 S.Ct. 1026, 1032–34, 94 L.Ed.2d 92 (1987) (undertaking reasonableness inquiry); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78, 482–85, 105 S.Ct. 2174, 2184–85, 2187–89, 85 L.Ed.2d 528 (1985) (similar). Since the rapid-fire shift of standards probably tainted this conclusion as well, we could simply vacate the alternative holding. We

---

6. This is because the two standards involve markedly different quanta of proof. So long as a prima facie standard obtained, FMI had neither a right nor a reason, in the course of "jurisdictional discovery," to ferret out all the supporting evidence regarding the confidential nature of what had been discussed in Waltham. By the same token, it had neither a right nor a reason to

document fully the allegedly improper uses of such confidences by BWC. But once the court shifted to a likelihood standard, the scope, tenor and degree of the prospective inquiry changed, and FMI was caught, like a fawn in the headlights of a speeding van, without the discovery it needed to prove its point.

choose instead to dissect it for three reasons: the district court's rationale is troubling, it has been reported in a published opinion, and the underlying issue may arise on remand.

■ The hallmark of reasonableness in the context of personal jurisdiction is "fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). We have tended to channel the quest for that imperative through a template that highlights five factors. The factors include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Pleasant St. I*, 960 F.2d at 1088. We have called the points that compose this template "the gestalt factors" because, in any given case, they may neither be amenable to mechanical application nor be capable of producing an open-and-shut result. Their primary function is simply to illuminate the equitable dimensions of a specific situation, thereby "put[ting] into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction" in that situation. *Pritzker*, 42 F.3d at 64.

In the case at bar, the trial court found that the first, fourth, and fifth factors did not favor one outcome over the other, but that the remaining two factors discouraged the exercise of jurisdiction. *See Foster–Miller*, 848 F.Supp. at 277. The court then invoked a sixth factor—the ability of a Canadian court to apply Massachusetts law competently and impartially—and concluded that even if "some harm had flowed to Foster–Miller from the Waltham meeting," the suit should be dismissed based on "considerations of due process." *Id.*

■ The district court's analysis is flawed. First and foremost, the court's added consideration—the absence of any reason to believe that a Canadian court would display bias or prove incapable of applying Massachusetts law—has no place in the minimum contacts calculus. Though the five gestalt factors should not necessarily be deemed collectively exhaustive, *see, e.g., FDIC v. British–American Ins. Co.*, 828 F.2d 1439, 1442 (9th Cir.1987) (recognizing additional factors), the element seized upon by the court below is of no relevance here. Moreover, it is already committed to the doctrine of *forum non conveniens. See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *see also Burger King*, 471 U.S. at 477 & n. 20, 105 S.Ct. at 2184 & n. 20 (specifically distinguishing between the primary role of the enumerated gestalt factors and the secondary role of considerations relevant to *forum non conveniens* ). The doctrines of personal jurisdiction and *forum non conveniens* share certain similarities, but they embody distinct concepts and should not casually be conflated. *Compare* Allan R. Stein, *Forum Non Conveniens and the Redundancy of Court–Access Doctrine*, 133 U.Pa.L.Rev. 781, 788–89 (1985) (distinguishing the doctrines) *with* Margaret G. Stewart, *Forum Non Conveniens: A Doctrine in Search of a Role*, 74 Cal.L.Rev. 1259 (1986) (arguing that certain factors currently considered under *forum non conveniens* doctrine should be subsumed under personal jurisdiction analysis). Consequently, the district court's self-proclaimed sixth factor adds nothing useful to the jurisdictional mix.[7]

■ The court also adopted several other questionable positions, likely influenced by its mistaken blending of the theories of personal jurisdiction and *forum non conveniens,* in the course of ascertaining that the second

---

7. To drive this conclusion home, we note two related points. First, the very case on which the district court relied in assigning weight to the added factor, *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944 (1st Cir.1991), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992), is a *forum non conveniens* case, not a personal jurisdiction case. Second, we are unable to discern a link between the judge's hosannas to the Canadian court system and his conclusion that a federal district court sitting in Massachusetts lacks jurisdiction. Assuming that neither of two courts poses an undue risk of biased or incompetent adjudication, there is nothing to be counted against either of them in working the jurisdictional calculus.

and third gestalt factors militated against the exercise of jurisdiction. For example, the court deviated from the thrust of the second factor by centering much of its discussion on "the implications of this litigation for a Canadian industry upon whom [sic] an entire population depends for electric power" and on the extent to which Canada's interests "dwarf" those of Massachusetts. *Foster–Miller*, 848 F.Supp. at 277. This emphasis distorts the directive that a court pondering the second factor must mull "the forum state's interest in adjudicating the dispute," *Pleasant St. I*, 960 F.2d at 1088. The purpose of the inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest. *See, e.g., Burger King*, 471 U.S. at 483 & n. 26, 105 S.Ct. at 2188 & n. 26 (flatly rejecting the notion that a non-forum state's "acknowledged interest might possibly render jurisdiction in [the forum] *unconstitutional*" and observing that "minimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute").

■ The district court's analysis is equally awry in its treatment of the third gestalt factor (which requires an assessment of "the plaintiff's interest in obtaining convenient and effective relief," *Pleasant St. I*, 960 F.2d at 1088). Although finding that "it is more convenient for the plaintiff to litigate this matter in domestic comfort," *Foster–Miller*, 848 F.Supp. at 277, the court offset this finding by invoking, *inter alia*, a presumed inability "to award plaintiff the full measure of relief that it seeks" because of doubts concerning both the propriety and the efficacy of enjoining a foreign national whose presence in Massachusetts had been fleeting. *Id.* This concern is beside any relevant point where a plaintiff's inability to obtain certain kinds of relief is wholly a product of her own choice of forum. At any rate, the plaintiff here explicitly informed the court of its willingness to forgo injunctive relief if necessary to salvage jurisdiction.

We have another problem with the district court's assessment of the third gestalt factor. The court downplayed FMI's convenience because the company "does business in Canada and is represented by presumably capable Canadian attorneys." *Id.* Putting this spin on the matter—emphasizing that the plaintiff could just as easily litigate in a Canadian court—effectively nullifies the plaintiff's choice to litigate its suit *not* in Canada but in Massachusetts. Though such judicial second-guessing may be proper in deciding transfer-of-venue motions or when the plaintiff's supposed convenience "seems to be . . . a makeweight," contrived purely for strategic advantage, courts considering jurisdictional issues generally should "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience. . . ." *Ticketmaster*, 26 F.3d at 211. So it is here.

We will not comment on the lower court's assessment of the first, fourth, and fifth gestalt factors. It is evident from what we have written to this point that the order of dismissal cannot plausibly rest on the existing assessment of reasonableness.

## VI. CONCLUSION

We have come full circle, back to our beginnings. The *Boit* framework is an expression of pragmatism—an authoritative recognition, informed both by experience and by the demands placed on the federal bench, that it is desirable for trial judges, when feasible, to give meaningful, yet not unduly burdensome, scrutiny to the question of jurisdiction at the early stages of particular types of cases. The pragmatic nature of the framework requires courts to proceed with caution, mindful of the risks of overapplication and of the need to give parties ample notice and opportunity to demonstrate that jurisdiction is, or is not, proper. In the case at hand, the district court failed to provide these latter necessities to FMI. The court then compounded its error by weighing extraneous elements in attempting to strike a balance on reasonableness. Thus, we find merit in FMI's appeal.

We need go no further. We vacate the order of dismissal. On remand, the district court should alert the parties in advance to the level of scrutiny that it will apply to the pending motion and the factual questions to which the standard will pertain. The court

should also allow such further discovery, if any, as may be desirable in light of its intentions. At the appropriate juncture, the court may accept submissions in such form as it deems proper and make its determination on relatedness. If the court deems the basic jurisdictional tests satisfied, it should then undertake a reasonableness analysis that comports with our precedents.[8] We take no view on the ultimate resolution of the issues to be addressed on remand, or on the proper weighing of the gestalt factors. Our concern at this stage is primarily with the court's methodology.

*Vacated and remanded. Costs in favor of appellant.*

---

8. We note that BWC's Rule 12(b) motion raised the matter of *forum non conveniens* as an independent basis for dismissal. The district court declined to reach that issue. *See Foster–Miller,* 848 F.Supp. at 277 n. 4. On remand, this issue may be raised again.