**BACK BAY FARM, LLC, Plaintiff**

v.

**Allyson COLLUCIO, d/b/a Ashmont Farms, Defendant**

**No. CIV.A.02–30099–KPN.**

United States District Court,
D. Massachusetts.

Sept. 27, 2002.

Philip Castleman, Springfield, MA, for Back Bay Farm, LLC, Plaintiff.

John Ferrara, Dalsey, Ferrara, Townsend & Albano, Springfield, MA, for Allyson Colucio dba Ashmont Farms, Defendants.

### MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Docket No. 4)

NEIMAN, United States Magistrate Judge.

In this diversity action, Back Bay Farm, LLC ("Plaintiff") alleges that Allison Colucio d/b/a Ashmont Farms ("Defendant") knowingly used false and deceitful tactics when selling Plaintiff a horse. The complaint alleges a single violation of the Massachusetts consumer protection statute, Mass. Gen. L. ch. 93A ("chapter 93A"). Currently at issue is Defendant's motion to dismiss the complaint for failing to state a claim upon which relief may be granted, for lack of personal jurisdiction and for improper venue. After hearing and for the reasons stated below, the court will deny Defendant's motion.[1]

### I. BACKGROUND

The factual background is taken verbatim from Plaintiff's complaint:

1. Plaintiff is a Massachusetts LLC with offices ... [in] Springfield ....

2. Defendant is an individual doing business as Ashmont Farms with [her] usual address ... in Middleburg, [Virginia].[2]

. . . . .

4. Plaintiff, in November, 2000[,] purchased from ... Defendant a horse named "Valentina" for the sum of $60,000.00 under the representation of ... Defendant that the horse was suitable for the average rider and was suitable for the purpose of a "show horse" for less then [sic] an expert rider.

5. Upon receipt of the horse in Massachusetts Lisa Kupsc [ ("Kupsc") ], [Plaintiff's] manager ... and an above average rider[,] found that in fact the horse could not be handled or ridden by a rider unless the rider was a very experience [sic] and professional horseman.

6. ... Defendant was so notified and agreed that the horse could not be ridden by the average rider and requested that the horse be sent to her farm in Florida where she would sell it and return the $60,000.00 to ... Plaintiff.

7. Plaintiff, at its expense, shipped the horse to Florida. Despite numerous communications and demands Defendant has refused to return the $60,000.00 and without notifying or asking permission shipped the horse to a farm in New Jersey. A demand letter as required under [chapter] 93A was sent to ... Defendant on November 19, 2001 without response.

8. Defendant has knowingly used false and deceitful tactics in fraudulently sell-

---

1. The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b).

2. Although the court will refer to Defendant as "she" or "her," i.e., Ms. Collucio, Defen-

dant acknowledges in her Notice of Removal that the suit, "in fact," is against "Ashmont Farm, Inc., a corporation that is incorporated in Florida with places of business in Wellington, Florida and Middleburg, Virginia." (Docket No. 1 ¶ 7.)

ing the horse to . . . Plaintiff in violation of [chapter] 93A.

(Complaint at 1–2.) Additional facts with respect to the personal jurisdiction issue are described below.

## II. DISCUSSION

In support of her motion to dismiss, Defendant asserts that Plaintiff's complaint fails to state a claim upon which relief may be granted, that the court lacks personal jurisdiction over Defendant, and that venue is improper. The court considers each of these three arguments in turn. In the end, the court concludes that the case should not be dismissed.

### A. FAILURE TO STATE A CLAIM

■ Echoing the language of Fed. R.Civ.P. 12(b)(6), Defendant argues in the last few paragraphs of her memorandum of law that Plaintiff's complaint "fails to state a claim against [her] upon which relief may be granted." (Docket No. 5 (Defendant's Brief) at 13–14.) Defendant's Rule 12(b)(6) argument, however, depends almost exclusively on facts and documents outside of those raised in the complaint. Accordingly, it is misplaced. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (observing in Rule 12(b)(6) context that "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is [ordinarily] forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56").[3]

Even if Defendant's Rule 12(b)(6) argument was properly presented, Plaintiff has sufficiently pled a violation of chapter 93A. Federal Rule of Civil Procedure 8(a)(2) states that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also* Fed.R.Civ.P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct."). According to the Supreme Court, under these "ordinary rules for assessing the sufficiency of a complaint . . . [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to evidence to support the claims." *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (citation and internal quotation marks omitted).

Moreover, with respect to chapter 93A, the Massachusetts Supreme Judicial Court has held that "the existence of unfair acts and practices must be determined from the circumstances of each case." *Nader v. Citron*, 372 Mass. 96, 360 N.E.2d 870, 876 (1977). In addition, the court observed that other "factual nuances" of a particular chapter 93A action might also "require elaboration through discovery and development at trial." *Id.See also id.* at 875–76 (discussing 93A claim in context of Mass. R. Civ. P. 8(a)(1) and noting that "[d]ecisions under the analogous Federal rule hold that a complaint is sufficient against a motion to dismiss if it appears that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theory on which he seems to rely may not be appropriate"). Such is the case here. In the court's view, Plaintiff has sufficiently pled a violation of chapter 93A and ought to be allowed to flesh out that claim through discovery. Accordingly, the court turns to Defendant's central contention, that the court lacks personal jurisdiction over her.

---

**3.** Defendant does not (nor could she) contend that her Rule 12(b)(6) argument has been converted into a request for summary judgment pursuant to Fed.R.Civ.P. 56. For conversion to take place, a plaintiff must "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). Plaintiff has had no such opportunity here.

## B. PERSONAL JURISDICTION

Rule 12(b)(2) provides the basis for Defendant's personal jurisdiction argument. *See id.* (a defendant, prior to filing an answer, may move to dismiss action for "lack of jurisdiction over the person"). A court's exercise of personal jurisdiction over a non-resident defendant, as here, presents a two-fold inquiry: (1) whether the plaintiff has demonstrated that the assertion of jurisdiction is authorized by statute, and, if authorized, (2) whether such assertion is consistent with basic due process requirements. *Sawtelle v. Farrell,* 70 F.3d 1381, 1387 (1st Cir.1995); *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995). The court will consider these two questions after describing some additional facts. *See Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 675, 681–82 (1st Cir.1992) (when faced with Rule 12(b)(2) motion, a plaintiff must go beyond the pleadings and affirmatively prove that sufficient contacts exist between the defendant and the foreign state) (citations omitted); *Callahan v. Harvest Bd. Intern., Inc.,* 138 F.Supp.2d 147, 152–53 (D.Mass.2001) (unlike Rule 12(b)(6) motion, "[t]he consideration of materials outside the complaint is appropriate in ruling on a [Rule 12(b)(2)] motion to dismiss for lack of personal jurisdiction") (citing cases).

### 1. *Plaintiff's Facts*

Along with her opposition, Plaintiff has submitted a number of personal jurisdiction-related facts. First, Plaintiff tenders an affidavit of its manager, Kupsc, which states as follows with respect to Plaintiff's initial contact with Defendant: "I was contacted in Massachusetts by an agent for … Defendant about the purchase of the horse and was familiar with the name of … Defendant due to her advertising in *The Chronicle of the Horse* magazine[,] to which I subscribe[,] and her internet web site." (Docket No. 7 (Plaintiff's Brief), Exhibit IV ¶ 9.) This initial contact apparently took place prior to November of 2000, (see *id.*, Exhibit VIII), and "was instituted through [Defendant's] agent with contact made in Massachusetts" (*id.*, Exhibit IV ¶ 9).

Plaintiff also attaches a one-page "Ashmont Farm, Inc." advertisement from a recent edition of *The Chronicle of Horse* magazine in which pictures and descriptions of four horses (but not Valentina) are displayed. (*Id.*, Exhibit VI (dated May 17, 2002).) The bottom of the page reads as follows:

*Many of these Wonderful horses are available for sale!*

*Don't Forget our Ponies too!*

Visit our website: www.ashmontfarm.com

540–253–5481

540–253–9612   Fax

(*Id.*) Similarly, a recent page from Defendant's web-site states the following: "Ashmont is one of the most successful sales, showing and breeding businesses in the United States. Our horses and ponies have dominated every major horse show in both performance and breeding divisions. We offer twenty to thirty outstanding horses and ponies." (*Id.*, Exhibit VII (dated July 24, 2002).) [4]

---

4. The web page also states "When You're Dreaming of A Champion … Today the dream is reality." This language is then followed by the following: pictures and captions of two prize-winning horses (but not Valentina); what appears to be links to another company; and an "on-site calculator" for "Hunter Points" and "Jumper Money." Finally, the page indicates that the web-site has registered over 64,000 hits since July 4, 1999. (*Id.*)

In addition, Kupsc notes in a July 27, 2001 letter she wrote to Defendant that she and her trainer, Chris Johnson ("Johnson"), "after receiving a call from [Defendant's] agent," flew to Virginia in November of 2000 in order to make the purchase. (*Id.*, Exhibit VIII.) It was at Defendant's premises in Virginia, Kupsc wrote, that the alleged deception apparently took place:

> The horse was represented to [us] as being the "the perfect horse" for an older beginner. While at your farm [Johnson] was very emphatic that the horse was being purchased for myself [sic] and that my riding ability could best be described as "a forty two year old short stirrup rider". At that time ... Johnson asked you point blank if the horse "could take a joke" due to my limited experience as a rider. You and your husband responded without hesitation "absolutely".

(*Id.*)

For his part, Johnson avers in his own affidavit that, based on Defendant's representations, he "signed a bill of sale on behalf of ... Plaintiff on November 27, 2000" and that Valentina was then delivered to Plaintiff's farm. (*Id.*, Exhibit V ¶¶ 2–4.)[5] In return, $60,000 was "transferred from [Kupsc's] Massachusetts bank to [Defendant's] bank in Virginia." (*Id.*, Exhibit IV ¶ 4.)

Finally, Kupsc's affidavit states the following:

> 5. Upon receipt of the horse it was found that even after four weeks the horse was so headstrong and unmanageable that she was a danger to ride.
> 6. ... Defendant was notified of the problem and a demand for the return of the purchase price was made. Defendant in lieu of refunding the $60,000.00 agreed that she would sell the horse by the end of February [of 2001] and return the purchase price at that time if [I] ship the horse to her farm in Florida. I shipped the horse as requested and failed to hear [a]nything more from ... Defendant until May [of 2001] when I was informed that ... Defendant had a buyer for the horse.
> 7. ... Defendant informed me that the horse had a fungus on her hoof and the buyer wanted it cleared up before completing the purchase. On or about August 15, 2001 I received a fax from ... Defendant which included a "bill of sale" which the buyers of the horse had requested as "they are sticklers for paperwork". I was asked to execute this new "bill of sale" which I would not do as it did not comply with the original bill of sale.
> 8. Numerous attempts to contact ... Defendant were to no avail and I requested our attorney to write to her demanding our purchase price or face legal action ....

(*Id.* ¶¶ 5–8.)

### 2. *Defendant's Facts*

Defendant supplies a number of additional jurisdictional facts as well. First, she states in an affidavit that she is the president of Ashmont Farm, Inc., which has "places of business (farms) in Middleburg, Virginia and Wellington, Florida." (Defendant's Brief, Exhibit A ¶ 3.) Defendant also avers that she is "not a resident of Massachusetts" and does "not own any real estate in the Commonwealth." (*Id.* ¶ 2.) As for Ashmont Farm, Inc.—a company "in the business of breeding, training, and selling horses"—Defendant further avows that the corporation "does not own property or have a place of business in

---

**5.** A copy of the November 27, 2000 "bill of sale" is appended to Plaintiff's memorandum of law, (see *id.*, Exhibit I), although Kupsc avers that the sale was actually "completed on November 24, 2000" (*id.*, Exhibit IV ¶ 3).

Massachusetts[,] ... have an agent or employee who resides in Massachusetts[,] ... regularly transact business or solicit business in Massachusetts ... [or] derive substantial revenue from sales of horses to Massachusetts residents." (*Id.* ¶¶ 4–8.)

Defendant also states in her affidavit that "Ashmont Farm, Inc. has sold few horses that were going to Massachusetts" and she "can only think of two such sales in the past five years, one of them being the horse sold to [Plaintiff]." (*Id.* ¶ 9.) With respect to Valentina, Defendant then avows as follows:

10. The sale of [Valentina] to [Plaintiff] was made through a broker or agent.

11. I was in Virginia during all of my communications with that broker or agent.

12. The horse was paid for by a wire transfer of funds to Ashmont Farm, Inc.'s bank account in Virginia.

13. The horse was picked up by [Plaintiff] in Virginia and [Plaintiff] arranged for the horse to be transported by a commercial transporter.

(*Id.* 10–13.) Defendant then appends a "bill of sale" dated November 24, 2000. However, that document, the court notes, contains only Defendant's signature. (*Id.*, Exhibit B.)[6]

Finally, Defendant attaches a "consignment agreement" dated February 2, 2001, which was executed by both Kupsc (on behalf of Plaintiff) and Defendant (on behalf of Ashmont Farm, Inc.). (*Id.*, Exhibit C.) The consignment agreement specifically states that, while Plaintiff "is the sole

owner of ... Valentina," Ashmont Farm, Inc. is the "exclusive agent to sell the animal." (*Id.* ¶¶ 1 and 2.) In addition, the agreement provides that Ashmont Farm, Inc. "may offer the animal for sale for [$75,000]" and that Plaintiff agreed to accept that sum less Ashmont Farm, Inc.'s right to be paid a fifteen percent commission. (*Id.* ¶¶ 3–5.) The agreement also states that its "term ... shall be until further notice, except that Ashmont [Farm, Inc.] may terminate [it] whenever in its opinion the animal becomes unsaleable for any reason for [$75,000]." (*Id.* ¶ 9.) Plaintiff, the agreement continues, "may terminate this agreement at any time with 14 days advance written notice to Ashmont [Farm, Inc.]," so long as "no deposit or sale transaction has already begun." (*Id.*) The consignment agreement concludes by stating that it "shall be governed by the laws of the State of Florida." (*Id.* ¶ 10.)

### 3. Statutory Considerations

With regard to the initial personal jurisdiction inquiry, the law of the forum state applies. *Sawtelle*, 70 F.3d at 1387 (citing cases). Here, both parties agree, personal jurisdiction depends, first, on the Massachusetts long-arm statute. In relevant part, that statute provides that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth." Mass. Gen. L. ch. 223A, § 3(a).[7]

---

**6.** It appears that the November 24, 2000 "bill of sale" appended to Defendant's memorandum of law is actually the one Kupsc received from Defendant on August 15, 2001, but refused to sign. (See Plaintiff's Brief, Exhibit IV ¶ 7.) Nonetheless, Defendant characterizes the November 24, 2000 document as the operative contract. (See Defendant's Brief at 2–3, 8, 10 and 12–13.)

**7.** Although Defendant, in her motion, addresses other prongs of the long-arm statute, (e.g., sections 3(b), 3(c) and 3(d)), Plaintiff seeks shelter only under section 3(a). Thus, Plaintiff argues merely that the court has personal jurisdiction over Defendant because Defendant transacts business in Massachusetts.

The parties' section 3(a) arguments are perfunctory. Defendant states merely that neither she nor her agent came to Massachusetts, all of her dealings with Plaintiff occurred while she was in Virginia or Florida, the bill of sale was executed in Virginia, and she accepted payment for the horse in Virginia. Plaintiff's argument is similarly sparse. It notes simply that Defendant regularly advertises in Massachusetts, contacted Plaintiff through Defendant's agent and sold Valentina knowing the horse was going to the Commonwealth. Plaintiff also observes that Defendant has sold at least one other horse destined for Massachusetts.

Despite the scant attention paid to section 3(a), the parties do cite a few apt decisions. Plaintiff relies principally on *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 625 N.E.2d 549 (1994). In *Tatro*, a Massachusetts plaintiff slipped and fell in a hotel bathtub in California. The Supreme Judicial Court found that the hotel transacted business in Massachusetts under section 3(a) based on a broad range of activities and solicitations within the Commonwealth. *See id.* at 552. The court observed that "[t]he 'transacting any business' clause in § 3 has been construed broadly." *Id.* at 551. (citations and internal quotation marks omitted). "Although an isolated (and minor) transaction with a Massachusetts resident may be insufficient," the court explained, "generally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." *Id.* at 551–52 (citations omitted). Given that the hotel in question engaged in a "broad[ ] range of activities",—it "solicited and obtained meeting and convention business from at least ten Massachusetts businesses, ... maintained telephone and mail contact with them ... [and] accept[ed] ... the plaintiff's room reservation"—the court

deemed it "obvious" that it transacted business in Massachusetts. *Id.* at 552.

Plaintiff also relies on *Hahn v. Vermont Law Sch.*, 698 F.2d 48 (1st Cir. 1983), in support of this court's personal jurisdiction over Defendant. In *Hahn*, cited approvingly in *Tatro*, the plaintiff-student sued his out-of-state law school after he received an "F" on an exam. The First Circuit, observing that the Massachusetts long-arm statute should be broadly construed, held that the law school's purposeful actions in mailing application information and an acceptance letter to the plaintiff in Massachusetts were sufficient, without more, to constitute transacting business under section 3(a). *See id.* at 50–51.

In counterpoint, Defendant cites two decisions in which personal jurisdiction was found not to lie under section 3(a). Both of those decisions, Defendant argues, militate against the exercise of jurisdiction here.

In the first, *Droukas v. Divers Training Academy, Inc.*, 375 Mass. 149, 376 N.E.2d 548 (1978), the Supreme Judicial Court held that the defendant, a Florida vendor, could not be haled into Massachusetts to defend a breach of warranty action arising from the sale of allegedly defective marine engines. *See id.* at 551–53. "[T]he defendant's only contacts with Massachusetts," the court noted, "were the placement of an advertisement in a publication distributed in the Commonwealth, the receipt in Florida of a telephone call from the plaintiff in Massachusetts in regard to the purchase of the two engines, the sending of correspondence to the plaintiff confirming the sale, and the shipment of the engines 'collect' to the plaintiff in Massachusetts." *Id.* at 551. It was also "undisputed that the defendant's principal place of business [was] in Florida[,] ... [i]t maintain[ed] no office in Massachusetts, ... own[ed][no] property

within the Commonwealth ... [and] neither [it], its corporate president, nor any of its agents ha[d] previously done business within the Commonwealth or had any contact here other than that detailed above." *Id.* On such facts, the court found, "the defendant's contacts with Massachusetts were insufficient to constitute the transaction of business in the Commonwealth so as to come within the reach of [section] 3(a)." *Id.*

The second section 3(a) decision Defendant cites is *Lyle Richards Intern., Ltd. v. Ashworth, Inc.,* 132 F.3d 111 (1st Cir. 1997). There, the First Circuit was confronted with a breach of contract and chapter 93A action brought by a Massachusetts company which served as the purchasing agent for the defendant, a California–Delaware corporation. The First Circuit found that jurisdiction did not exist under section 3(a) for the contract claim. *Id.* at 113–14.[8] Key to the court's decision was the fact that the plaintiff had made an unsolicited offer to be the defendant's purchasing agent. *See id.* 112–13. In addition, the court found that the agreement, although "drafted and signed by [the plaintiff] in Massachusetts," was negotiated "by phone and at meetings in California and China." *Id.* at 112. Moreover, the court noted, "most performance required from [the plaintiff] under the Agreement was to be rendered *outside* Massachusetts [and] ... [t]he Agreement did not even require that the internal administrative functions actually conducted by [the plaintiff] in Massachusetts be performed there, such as arranging for merchandise shipments from the Chinese–Taiwanese suppliers to [the defendant] in California, receiving price quotes or product samples from the Asian factories, or reporting to [the defendant] on market conditions and the availability of merchandise." *Id.* at 113

(emphasis in original). Finally, the court observed that the parties' agreement did not "indicate that [the plaintiff] either needed or intended to perform its 'quality control' responsibilities in Massachusetts." *Id.*

Even with the assistance of the cited decisions, the section 3(a) question in the case at bar remains difficult to answer. On the one hand, Defendant's modest contacts with Massachusetts appear "isolated" or "minor." On the other hand, it seems reasonable to conclude that, given the facts presented, Defendant, through her agent, not only targeted Plaintiff but also, with or without an agent, purposefully and successfully engaged in other horse sales with Massachusetts residents. At bottom, the court believes that Plaintiff's cause of action is one "arising from" Defendant's "transacting business" in Massachusetts such that jurisdiction over her pursuant to section 3(a) exists. Several reasons support this conclusion. First, although the parties do not argue the point, the court finds that the chapter 93A claim is one "arising from" Defendant's initial contact with a Massachusetts consumer. As the First Circuit stated in *Lyle Richards,* "[t]he 'arising from' clause ... is to be generously construed in favor of asserting personal jurisdiction, by applying the following 'but for' causation test: Did the defendant's contacts with the Commonwealth constitute the first step in a train of events that resulted in the personal injury." *Id.,* 132 F.3d at 14 (citation and internal quotation marks omitted). Here, unlike the cases she cites, Defendant appears to have made the initial contact with Plaintiff. Kupsc avers not only that she "was contacted in Massachusetts by an agent for ... Defendant about the purchase of the horse," but that the sale "was instituted through [Defendant's] agent

8. The court considered the chapter 93A claim solely under section 3(c) of the Massachusetts long-arm statute which, as indicated, has not been argued here.

with contact made in Massachusetts."[9] In the court's view, this initial contact by Defendant's agent began the "train of events" which resulted in the alleged chapter 93A violation. Accordingly, like the hotel in *Tatro*, Defendant purposefully "solicited and obtained" Plaintiff's business and Plaintiff's complaint is one "arising from" that contact.

Second, the caselaw indicates that the purposeful and successful solicitation by a defendant of a Massachusetts customer may, *when combined with other forum contacts*, amount to "transacting business" under section 3(a). *See Tatro*, 625 N.E.2d at 554 (viewing defendant's agreement to provide plaintiff with hotel accommodations in California in conjunction with its solicitation of business in Massachusetts in section 3(a) calculus). *Cf. Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality observation that placement of product into stream of commerce, plus "something more," e.g., advertising, establishing channels for advice to customers in the state or using a sales agent in the forum, might subject defendant to jurisdiction in the forum state). Here, as indicated, Defendant concedes that she has sold other horses (she says "few") "that were going to Massachusetts." *Compare Northern Light Tech., Inc. v. Northern Lights Club*, 97 F.Supp.2d 96, 104 (D.Mass. 2000) (refusing to find personal jurisdiction under section 3(a) where "none of the Defendants entered into a commercial relation with a Massachusetts resident"), *aff'd*, 236 F.3d 57 (1st Cir.), *cert. denied*, 533 U.S. 911, 121 S.Ct. 2263, 150 L.Ed.2d 247 (2001). In addition, Defendant advertised her horses to Massachusetts consumers, including Plaintiff, via a world wide web page describing "sales ... in the United States" and in a magazine. These extra contacts, the court believes, further tip the scale in favor of personal jurisdiction under section 3(a).[10]

9. To be sure, Defendant's counsel states in his memorandum of law that *"Plaintiff, through an employee or agent, contacted an independent horse broker for purposes of purchasing a horse from Ashmont Farm, Inc."* (Defendant's Brief at 2 (emphasis added).) However, there is no affidavit or other evidence to that effect.

10. That being said, the court would not find the existence of personal jurisdiction if the web page provided here was Defendant's *only* contact with Massachusetts. In internet-personal jurisdiction cases, some courts have looked to the "interactivity" of the web-site and concluded that "passive" pages—i.e., ones that only make information available to those who are interested—do not provide independent grounds for the exercise of personal jurisdiction. *See e.g., Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997). *See also Hasbro, Inc. v. Clue Computing, Inc.*, 994 F.Supp. 34, 40 (D.Mass. 1997) (applying *Zippo* ). The page at issue here is essentially passive and, thus, would not independently provide for jurisdiction under a *Zippo* analysis. However, even viewing the web-site here as more than a static adver-

tisement (e.g., it has "links" and an "on-site calculator"), the court would be reluctant to follow *Zippo* and transform those interactive elements, by themselves, into the "transacting of business." *See generally* Nathan A. Olin, *The A–B–C–s of Targeting: A Formula for Resolving Personal Jurisdiction–Internet Issues Within the District of Massachusetts*, 23 W. New. Eng. L.Rev. 237, 251–55 (2002) (describing the current "movement ... to look deeper than the mere level of inactivity or passivity of a particular web-site"). *See also* Robert W. Hamilton & Gregory A. Castanias, *Tangled Web: Personal Jurisdiction and the Internet*, 24 No. 2 LITIG. 27, 34 ("If, in order to avoid the risk of being haled into [every] court across the country, you must limit your company's use of the Web to simply a passive, static Website, then why bother?"); Am. Bar Ass'n Global Cyberspace Jurisdiction Project, *Achieving Legal and Business Order in Cyberspace: A Report on Global Jurisdiction Issues Created by the Internet*, at 60 n. 1 (July 10, 2000), at *http://www.abanet.org/buslaw/cyber/initiatives/draft.rtf* ("If each web site subjected its sponsor to global jurisdiction, many would forego use of the technology for fear of its secondary costs."); *cf. id.* at 63 (noting

Third, and perhaps most importantly, there are several unique facts that further tie Defendant to Plaintiff in Massachusetts. For example, it appears that Kupsc and Johnson agreed to fly to Virginia only after they received a call from Defendant's agent, the very person who had initiated the transaction. Also, in February of 2001, after Plaintiff shipped the horse from Massachusetts to Virginia, the parties negotiated a consignment agreement. Thereafter, Defendant contacted Plaintiff with information about a possible sale to a third party. Then, in August of 2001, Defendant attempted to persuade Plaintiff to sign a new "bill of sale" by sending a draft to Plaintiff in Massachusetts. In short, the court believes that, based upon the totality of the circumstances, there are sufficient facts to conclude that Defendant "transacted business" in Massachusetts under section 3(a) of the Commonwealth's long-arm statute and that the action is one "arising from" those transactions.

### 4. *Due Process Requirements*

In addition to the statutory inquiry, the court must necessarily determine whether the assertion of jurisdiction over Defendant would comport with the restraints imposed by the due process clause of the United States Constitution. The First Circuit has designated "three distinct components" to this due process inquiry, "relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness," *Foster–Miller*, 46 F.3d at 144, each of which must be satisfied, *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir.1994). In the court's view, Plaintiff has sufficiently satisfied all three components.

### a. Relatedness

■ Defendant first argues that she established no meaningful contacts, ties or relations with Massachusetts and, therefore, that Plaintiff has not satisfied the relatedness inquiry. In light of all the facts discussed above, however, the court believes that, at least for personal jurisdictional purposes, Defendant is sufficiently tied to the Commonwealth under the relatedness prong. As the First Circuit has stated, the relatedness requirement—"that a suit arise out of, or be related to" Defendant's forum activities—"ensures that the element of causation remains in the forefront." *Ticketmaster–New York*, 26 F.3d at 206, 207. Here, as the court has already determined, Plaintiff's claim arises from Defendant's Massachusetts activity. The relatedness element has thus been met.

### b. Purposeful Availment

■ The "purposeful availment" requirement of the due process inquiry is designed to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Plaintiff must demonstrate that Defendant's contacts "represent a purposeful availment of the privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of its laws and making [Defendant's] involuntary presence be-

that, because of *Zippo*, courts have become "clearly ... convinced that the nature of a defendant's web site is relevant to the jurisdictional issue, but a failure to articulate why it is relevant makes it difficult to determine where the jurisdictional line should be drawn in cases that fall between *Zippo*'s two ex-

tremes"). *Cf. Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F.Supp. 456, 471 (D.Mass. 1997) (finding it "troubl[ing] ... to force corporations that do business over the Internet, precisely because it is cost-effective, to now factor in the potential costs of defending against litigation in each and every state").

fore [a Massachusetts] court foreseeable." *Pritzker v. Yari,* 42 F.3d 53, 61 (1st Cir. 1994). The cornerstones upon which the purposeful availment component rests are voluntariness and foreseeability. *Ticketmaster–New York,* 26 F.3d at 207.

The facts of the case at bar demonstrate that Defendant voluntarily entered into a relationship with Plaintiff and that it was reasonably foreseeable that she would have further contact with Massachusetts. As described, the facts as presented indicate that Defendant, through her agent, initiated contact with Plaintiff with respect to the transaction at issue. Defendant also purposefully solicited and engaged in business relationships with other buyers of horses destined for Massachusetts. Finally, as indicated, Defendant engaged in additional post-transaction contact with Plaintiff in the Commonwealth. Thus, she purposefully availed herself of this forum.

c. Reasonableness

■ As to the last component, the assertion of jurisdiction over a defendant must also be reasonable, that is, it must "not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). *See Asahi,* 480 U.S. at 113, 107 S.Ct. 1026. As the First Circuit has explained,

[T]he Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair. In this context, gauging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness.... [T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful

availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.

*Ticketmaster–New York,* 26 F.3d at 210. In analyzing this reasonableness prong, the court, as further directed by the First Circuit, must weigh five factors: (1) the burden on the defendant in appearing; (2) the interest of the forum state in adjudicating the dispute; (3) the interest of the plaintiff in obtaining convenient and effective relief; (4) the interest of the judicial system in obtaining the most effective resolution of the controversy; and (5) the interests common to all sovereigns in promoting substantive social policies. *Foster–Miller,* 46 F.3d 138 at 150.

The court believes that, on balance, the five reasonableness factors favor Plaintiff. First, although there is clearly a burden on Defendant in having to litigate this case far from home, she has not demonstrated any special or unusual hardship. *See Pritzker,* 42 F.3d at 64; *Northern Light Tech.,* 97 F.Supp.2d at 107. Second, Massachusetts certainly has an interest in preventing the violation of its consumer protection statute. Third, Defendant does not dispute that the convenience of Plaintiff, who has specifically sought this forum, weighs in favor of Massachusetts. The fourth and fifth factors add little to the mix: the judicial systems' interest in obtaining the most efficient resolution of a case such as this is generally considered "a wash," *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 718 (1st Cir.1996), and the interests of competing social policies, *id.* at 719, has little impact here.

5. *Viability*

■ Defendant finally argues that the court may not "base its exercise of juris-

diction on claims which are not viable." *Callahan*, 138 F.Supp.2d at 165 (citation omitted). As indicated, however, the court does not believe the complaint fails to state a claim upon which relief may be granted. Still, it is worth addressing one specific personal jurisdiction argument Defendant makes with respect to viability.

Defendant characterizes the complaint as involving section eleven of chapter 93A—which allows a consumer protection suit to be brought by and against "[a]ny person who engages in the conduct of any trade or commerce," Mass. Gen. L. ch. 93A, § 11—as opposed to section nine— which permits a chapter 93A action to be brought only by "[a]ny person, other than a person entitled to bring an action under section eleven," Mass. Gen. L. ch. 93A, § 9. The distinction is important for personal jurisdiction purposes, Defendant contends, .because section eleven, unlike section nine, also provides for a jurisdiction-sounding affirmative defense, that is, there can be no liability under section eleven where "the actions or transactions constituting the alleged ... unfair or deceptive act or practice [have not] occurred *primarily and substantially within the commonwealth*." Mass. Gen. L. ch. 93A, § 11 (emphasis added). In essence, Defendant argues as follows: her alleged deceit did not occur "primarily and substantially within the commonwealth"; the chapter 93A claim, therefore, is not viable; ergo, personal jurisdiction does not lie.

In the court's view, the ultimate viability of the claim, as well as Defendant's section eleven affirmative defense, is for another day. Even assuming section eleven governs, the case law is clear that the personal jurisdiction inquiry is separate and distinct from the question of whether the allegedly deceptive acts occurred "primarily and substantially within the commonwealth." *See Sonesta Intern. Hotels Corp. v. Cent. Fla. Investments, Inc.*, 47 Mass.

App.Ct. 154, 712 N.E.2d 607, 611–13 (1999). *See generally Amcel Corp. v. Intern. Executive Sales, Inc.*, 170 F.3d 32 (1st Cir.1999); *Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.*, 788 F.Supp. 54 (D.Mass.1991). Moreover, as the First Circuit has directed, a section eleven cause of action, attacked via a motion to dismiss, should survive a "primarily and substantially" challenge so long as the complaint alleges that the plaintiff is located, and claims an injury, in Massachusetts. *See Amcel*, 170 F.3d at 36. Such is the case here. (See Complaint ¶¶ 1, 5–8.) In short, Plaintiff has sufficiently pled a chapter 93A violation under Rule 8's liberal standards and is entitled to further define the contours of that claim—either as a section nine or section eleven claim— through discovery.

### 6. *Summary*

In sum, the viability question is, at best, premature. Moreover, since Plaintiff has satisfied the relatedness, purposeful availment and reasonableness inquiries, the assertion of jurisdiction over Defendant comports with due process. The court also believes, for the reasons described, that jurisdiction over Defendant is supported by section 3(a) of the Massachusetts long-arm statute. Accordingly, the court rejects Defendant's Rule 12(b)(2) argument.

### C. *VENUE*

Finally, Defendant's conclusory argument to the contrary, the court believes that venue in Massachusetts is permissible under 28 U.S.C. § 1391(a)(1) (allowing diversity action to be brought in a judicial district where the defendant resides) since Defendant is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). *See Kolash v. Vermont Ctr. for Deaf & Hard of*

*Hearing, Inc.*, 2002 WL 1465768, at *2 (D.Mass. July 9, 2002). To be sure, section 1391(c) applies only when the defendant is a "corporation" and here Defendant has been sued as a "person" doing business as a corporate entity. Any distinction between these two forms, however, is of no moment since, as indicated, Defendant acknowledges that the suit, "in fact," is against "Ashmont Farm, Inc., a corporation that is incorporated in Florida with places of business in Wellington, Florida and Middleburg, Virginia." [11]

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's complaint is DENIED. The clerk shall schedule an initial scheduling conference.

IT IS SO ORDERED.

---

**11.** In any event, the venue statute also provides that "if there is no district in which the action may otherwise be brought," venue will lie in "a judicial district in which *any* defendant is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(a)(3) (emphasis added).